# EXHIBIT 1

PLTFS NOL – 000001

**California Secretary of State**
Electronic Filing



# Corporation - Statement of Information

| | |
|---|---|
| Entity Name: | MEDTRONIC, INC. |

| | |
|---|---|
| Entity (File) Number: | C0730538 |
| File Date: | 01/04/2021 |
| Entity Type: | Corporation |
| Jurisdiction: | MINNESOTA |
| Document ID: | GN28695 |

**Detailed Filing Information**

1. Entity Name:

   MEDTRONIC, INC.

2. Business Addresses:

   a. Street Address of Principal
      Office in California:

   b. Mailing Address:

      710 Medtronic Parkway
      Minneapolis, Minnesota 55432
      United States of America

   c. Street Address of Principal
      Executive Office:

      710 Medtronic Parkway
      Minneapolis, Minnesota 55432
      United States of America

3. Officers:

   a. Chief Executive Officer:

      Geoffrey  Martha
      710 Medtronic Parkway
      Minneapolis, Minnesota 55432
      United States of America

   b. Secretary:

      Bradley  Lerman
      710 Medtronic Parkway
      Minneapolis, Minnesota 55432
      United States of America

Document ID: GN28695

PLTFS NOL – 000002

Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.

# California Secretary of State
## Electronic Filing

Officers (cont'd):

    c.  Chief Financial Officer:

Karen  Parkhill
710 Medtronic Parkway
Minneapolis, Minnesota 55432
United States of America

4.  Director:

Not Applicable

Number of Vacancies on the Board of Directors:

Not Applicable

5.  Agent for Service of Process:

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA    AS CSC - LAWYERS INCORPORATING SERVICE (C1592199)

6.  Type of Business:

holding company

By signing this document, I certify that the information is true and correct and that I am authorized by California law to sign.

Electronic Signature:   Anne Ziebell

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GN28695

# EXHIBIT 2

PLTFS NOL – 000004

# Medtronic

**Employment Law Department**

710 Medtronic Parkway
Minneapolis, MN 55432
USA
www.medtronic.com

Heather C. Fokken
*Corporate Legal Counsel*

tel 612.437.2097
heather.c.fokken@medtronic.com

April 20, 2021

*VIA* **FEDERAL EXPRESS**
(tel. 210-379-4830)

Charles R. Boykin
938 Olivia View
San Antonio, TX 78260

RE:      **Post-Employment Restrictions**

Dear Mr. Boykin:

We understand that you are now providing services to Dexcom, Inc., a competitor of Medtronic. I am writing to remind you of your post-employment obligations under the Medtronic Employee Agreement ("Agreement") you signed on March 4, 2020, and to request information confirming that you are not violating any of those obligations. A copy of that Agreement is enclosed for your review.

First and foremost, you agreed in paragraph 4.1 of your Agreement that for a period of two (2) years following your termination of employment with Medtronic that you would not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT. A CONFLICTING ORGANIZATION is one that "engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT."

COMPETITIVE RESEARCH AND SUPPORT is defined in paragraph 1.2 as:

> any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulatory or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT.

COMPETITIVE PRODUCT is defined in paragraph 1.1 as:

> goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

A MEDTRONIC PRODUCT is defined in paragraph 1.8 as:



EXHIBIT A

Charles R. Boykin
April 20, 2021
Page 2

any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

You further agreed in paragraph 3.6 of your Agreement that you would not use or disclose any Medtronic CONFIDENTIAL INFORMATION to or for the benefit of anyone other than Medtronic.  You further agreed you would not render services in a capacity that would involve the use, disclosure or reliance upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose, or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services.  CONFIDENTIAL INFORMATION is defined in paragraph 1.3 as follows:

any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

In addition, you agreed in paragraph 4.2 of your Agreement that for one (1) year following your employment with Medtronic you will not directly or indirectly solicit, cause to be solicited, or participate in or promote the solicitation of any person to terminate that person's employment with Medtronic or to breach that person's employment agreement with Medtronic, or to perform services for or become employed by a CONFLICTING ORGANIZATION.

Finally, you agreed in paragraph 4.3 of your Agreement that you would immediately inform Medtronic if you have accepted an offer of employment from any new employer, and immediately disclose to Medtronic in writing the identity of any new employer, the job title of your new position, and a description of any services to be rendered to that employer.

Charles R. Boykin
April 20, 2021
Page 3


Dexcom is a competitor of Medtronic's Diabetes business, so we are very concerned about your compliance with your Agreement, in light of your new position. In order to sufficiently address our concerns, we need further information about your position with Dexcom. Please respond within ten (10) days of this letter with the following:

- A description of the position you have accepted, including your job title; the title of the employee to whom you will report; a description of your job duties and responsibilities, including the specific products and product lines for which you will be responsible; and your official start date of employment;

- A representation that you have returned all Medtronic Property, documents and things to Medtronic and do not have in your custody or control any documents (in any form), emails or electronic documents that refer to, reflect, or contain Medtronic CONFIDENTIAL INFORMATION; and

- A representation that you have had access to and knowledge of Medtronic CONFIDENTIAL INFORMATION, that you understand you are obliged to keep such information confidential and not use or disclose it, directly or indirectly, for the benefit of any third party for as long as the information remains confidential, and that you will discharge your duties on behalf of your new employer without using, disclosing or relying upon such information.

I look forward to receiving your response. Until such time that Medtronic is sufficiently assured that you have not and will not violate any of your post-employment obligations to Medtronic, we reserve all rights under your Agreement with respect to your new position. A copy of this letter will be sent to Dexcom so they are aware of your obligations to Medtronic and our concerns about your new position.

Should you have any questions regarding the above information, please feel free to contact me.

Sincerely,

**MEDTRONIC, INC.**

Heather C. Fokken
Corporate Legal Counsel

HCF/br

encl.

cc:     Patrick Murphy, Esq. (w/ encl.) (via Federal Express)
        EVP, Chief Legal Officer
        DEXCOM, INC.
        6340 Sequence Drive
        San Diego, CA 92121

# EXHIBIT 3

PLTFS NOL – 000008

# Medtronic

**Employment Law Department**

710 Medtronic Parkway
Minneapolis, MN 55432
USA
www.medtronic.com

Heather C. Fokken
*Corporate Legal Counsel*

tel  612.437.2097
heather.c.fokken@medtronic.com

May 21, 2021

*VIA* **FEDERAL EXPRESS**
(tel. 210-379-4830)

Patrick Murphy, Esq.
EVP, Chief Legal Officer
**DEXCOM, INC.**
6340 Sequence Drive
San Diego, CA 92121

RE:     **Charles Boykin**

Dear Mr. Murphy:

On April 20, 2021, I sent Charles Boykin the enclosed letter.  The letter outlined his post-employment obligations and requested that he provide information pursuant to paragraph 4.3 of his Medtronic Employee Agreement ("Agreement") that would assure Medtronic he intended to comply with his Agreement.  Dexcom was also copied on this letter.  To date, I have not received any response from Mr. Boykin or Dexcom. Medtronic is extremely concerned about the confidential information that Mr. Boykin may be sharing, and we don't understand how Mr. Boykin can work for Dexom without violating his noncompete obligations to Medtronic.  We ask that you provide the requested information and written assurances by **Wednesday, May 26, 2021**.

Please be aware that it is Medtronic's intention to protect its interest and rights and we are prepared to take all actions necessary to address any unfair competition and to protect and ensure the integrity of our confidential and proprietary information.  Until such time that Medtronic is sufficiently assured that Mr. Boykin has not and will not violate any of his post-employment obligations to Medtronic, we reserve all rights under his Agreement with respect to his new position.



EXHIBIT C

May 21, 2021
Page 2

I look forward to receiving Dexcom's response.  Should you have any questions in the meantime, please contact me.

Sincerely,

**MEDTRONIC, INC.**

Heather C. Fokken
Corporate Legal Counsel

HCF/cox

encl.

# EXHIBIT 4

PLTFS NOL – 000011



July 14, 2021


<span style="font-variant: small-caps;">Via Email Only</span>

Kellin Chatfield
General Counsel
Dexcom
Kellin.chatfield@dexcom.com

Re:    Charles Boykin's Employment with Dexcom

Dear Ms. Chatfield:

Our firm is outside legal counsel for Medtronic.  Medtronic has retained Fredrikson & Byron to address Mr. Boykin's current breach of his Medtronic Employee Agreement as a result of his continued employment as Senior Director of the Call Center with Dexcom.  I understand that you have previously been communicating with Heather Fokken at Medtronic.  From this point forward, please address all communications to my attention.

As you know, Heather Fokken wrote to Dexcom and Mr. Boykin on April 20, 2021, to notify each of Mr. Boykin's continuing obligations to Medtronic under the Medtronic Employee Agreement he signed on March 4, 2020 (the "Medtronic Employee Agreement"), and to request confirmation that Mr. Boykin was not violating any of those obligations.  On July 1, 2021, you sent a short response to Ms. Fokken which relayed only that Dexcom has instructed Mr. Boykin to not share any Medtronic proprietary information in his role at Dexcom.  You did not address Mr. Boykin's continued employment with Dexcom in violation of non-competition obligations contained in Section 4.1 of the Medtronic Employee Agreement, nor did you address Mr. Boykin's potential use of Medtronic CONFIDENTIAL INFORMATION in his Senior Director role with Dexcom.

As you now know, the Medtronic Employee Agreement – ***to which Mr. Boykin agreed while working and residing in San Antonio, Texas*** – contains the following obligations:

> Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

Attorneys & Advisors    Fredrikson & Byron, P.A.    USA / China / Mexico
Main 612.492.7000    200 South Sixth Street, Suite 4000    Minnesota, Iowa, North Dakota
Fax 612.492.7077    Minneapolis, Minnesota 55402-1425    fredlaw.com

DEF-NDD-100012

EXHIBIT G

July 14, 2021
Page 2

COMPETITIVE RESEARCH AND SUPPORT is defined in paragraph 1.2 as:

> any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulatory or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT.

COMPETITIVE PRODUCT is defined in paragraph 1.1 as:

> goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

A MEDTRONIC PRODUCT is defined in paragraph 1.8 as:

> any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

Moreover, Mr. Boykin further agreed in paragraph 3.6 of his Agreement that he would not use or disclose any Medtronic CONFIDENTIAL INFORMATION to or for the benefit of anyone other than Medtronic. He further agreed *he would not render services in a capacity that would involve the use, disclosure or reliance upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose, or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services*. CONFIDENTIAL INFORMATION is defined in paragraph 1.3 as follows:

> any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value

July 14, 2021
Page 3

from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

These two provisions work together to ensure that employees who are provided with and help contribute to Medtronic CONFIDENTIAL INFORMATION during the course of their employment with Medtronic do not provide services to CONFLICTING ORGANIZATIONS for a period of two (2) years post-employment with Medtronic. There is no doubt that Dexcom is a CONFLICTING ORGANIZATION as defined by the Medtronic Employee Agreement. Moreover, there is no doubt that Mr. Boykin is providing services to Dexcom in connection with a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

In his brief description on LinkedIn about what his job entails at Dexcom, Mr. Boykin notes that he:

Oversees all strategic and tactical aspects of change management for projects, initiatives and organizational transformation. Oversees *process improvements and/or Voice of the Customer functions* for an assigned line of business, business partnership or staff area.

Chuck has helped deliver total cost savings employing continuous improvement, lean manufacturing and best practice methodologies across supply chain management, operations, *customer relationship, call center functions*, quality and administrative services. Lead efforts to *increase product/customer quality redesigns*, while reducing costs across multiple business segments. *Ability to enhance staff performance through training and rollout of best practice processes, tools and techniques* leading to increased employee retention and savings. Has a proven success record and high degree of success in improving contact center performance, while striking a balance between cost, revenue

July 14, 2021
Page 4

and customer satisfaction. He has led teams focused on regulatory compliance to include FDA, CMS, OSHA, and State/Local governing agencies.

(emphasis and highlighting added). Mr. Boykin's role with Medtronic was nearly identical. During Mr. Boykin's employment with Medtronic as the Senior Manager Technical Support, he:

- Was accountable for the retention, acquisition, and development of current and future staff to meet the needs of the business;

- Was accountable for day-to-day tech support service levels and driving strategy in action to improve care and patient experience;

- Provided Technical Support, call center management, back-office support such as Solutions, Patient Outreach and any other services;

- Supported attainment of the highest quality standards on the team's output;

- Collaborated with leaders to develop strategies to improve team metrics and performance;

- Aligned strategies to enhance the team's effectiveness and efficiency including synchrony between multiple job areas/teams managed.

- Proposed modifications to functional operating policies and day-to-day processes;

- Worked with stakeholders to drive revenue growth and improve operational processes and reducing overall business costs; and

- Led process improvement discussions and functions.

All of these functions directly overlap with his current Senior Director role with Dexcom. Importantly, in his role as Senior Manager Technical Support, Mr. Boykin gained significant knowledge of Medtronic's confidential and proprietary quality assurance processes, research and development relating to new products and how to support them, detailed information regarding Medtronic product performance, complaint volumes, complaint data, processes for addressing patient questions and complaints, troubleshooting guidelines, technical support processes for products, optimization processes, and FDA audit information – all of which would be easily used

July 14, 2021
Page 5

to unfairly benefit Dexcom in the course of Mr. Boykin's work there.  This is exactly what the non-competition provision is intended to prevent.[1]

Medtronic has been seeking a satisfactory response from Mr. Boykin and Dexcom regarding Mr. Boykin's continued violation of his obligations to Medtronic since April 20, 2021, to no avail.  Therefore, I must receive a response before **5:00 Central on Monday July 19th** or Medtronic will further assess all necessary and appropriate legal action to protect its business interests.  We have today also sent a letter to Mr. Boykin demanding the same.

I look forward to hearing from you.

Very truly yours,

*/s/ Teresa Thompson*

Teresa M. Thompson
*Chair, Trade Secrets and Noncompete Groups*
**Direct Dial:**  612.492.7347
**Email:**  tthompson@fredlaw.com

---

[1] Due to the complete failure to address the non-competition provision and use of confidential information, it appears that Mr. Boykin and/or Dexcom are operating under the mistaken assumption that the non-competition provisions are no longer enforceable because he now lives in California.  Medtronic strongly disagrees with this mistaken assumption and has successfully litigated this issue in the past (as have many other companies).  The noncompete remains viable and enforceable because he signed and agreed to the provision while living and working in Texas.

# EXHIBIT 5

PLTFS NOL – 000017

**From:**          Kellin Chatfield <kellin.chatfield@dexcom.com>
**Sent:**          Thursday, July 1, 2021 11:35 AM
**To:**            heather.c.fokken@medtronic.com
**Cc:**            Patrick Murphy
**Subject:**       Mr. Charles Boykin
**Attachments:**   UPS tracking number.PNG

**Follow Up Flag:**   Follow up
**Flag Status:**      Flagged

Ms. Fokken,

I am writing in response to your recent voicemail and letter dated April 20, 2021 regarding Mr. Boykin.

Mr. Boykin has already been instructed not to share any Medtronic proprietary information in his role at Dexcom.  Mr. Boykin confirmed that he has not disclosed, nor will he disclose, any Medtronic confidential information to Dexcom.

It is my understanding that Mr. Boykin also confirmed, via letter to you, that he will not disclose any Medtronic confidential information to Dexcom.  I am attaching a copy of the tracking number for his letter.

Regards,

Kellin

**Kellin Chatfield**
General Counsel,
EMEA, APAC, LATAM, Litigation
858.203.6088 | www.dexcom.com



*This email may be protected by attorney-client privilege and/or attorney work product.*

PLTFS NOL – 000018

# EXHIBIT 6

PLTFS NOL – 000019



PROCOPIO
525 B Street
Suite 2200
San Diego, CA 92101
T. 619.238.1900
F. 619.235.0398

BROOK T. BARNES
P. 619.525.3810
brook.barnes@procopio.com

DEL MAR HEIGHTS
LAS VEGAS
ORANGE COUNTY
PHOENIX
SAN DIEGO
SILICON VALLEY

July 19, 2021

VIA E-MAIL (TTHOMPSON@FREDLAW.COM)

Teresa M. Thompson
Chair, Trade Secrets and Noncompete Groups
Fredrickson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425

Re:   Charles Boykin's Employment with Dexcom

Dear Ms. Thompson:

Please be advised this Firm represents Dexcom in the above referenced matter and all future correspondence should be directed to us. This responds to your July 14, 2021 letter regarding Mr. Boykin's prior employment with Medtronic. We trust you will immediately cease all threatened litigation against Dexcom and Mr. Boykin after reviewing the facts and legal authority set forth in this letter.

## I.   Mr. Boykin Has Not and Will Not Share Any Confidential and or Proprietary Information

Most prescient to Medtronic's allegations is its continued refusal to acknowledge that both Mr. Boykin and Dexcom repeatedly informed Medtronic that no confidential and/or proprietary information has been (or will be) provided to Dexcom by Mr. Boykin. Indeed, Dexcom unequivocally instructed Mr. Boykin to keep all confidential and or proprietary information to himself and to not rely upon it in performing his work at Dexcom.  As confirmed by Mr. Boykin on April 22, 2021 and Ms. Chatfield on July 1, 2021, there has been no disclosure of Medtronic's confidential and/or proprietary information.  To be clear, Mr. Boykin manages Dexcom's technical support for customers and has no visibility or impact on Dexcom's research and development. His work in dealing with the complaints of disgruntled patients or submitting required disclosures to FDA regarding such complaints poses no threat to

procopio.com



Medtronic's trade secrets, confidential or proprietary information.  The assertion that Mr. Boykin would rely upon the same skills to retain clients that he utilized at Medtronic could somehow constitute proprietary information is factually unfounded and legally deficient. Specifically, California courts have rejected such an inevitable disclosure theory and held "a former employee may use general knowledge, skill, and experience acquired in his or her former employment in competition with a former employer." *Retirement Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009).

A finding to the contrary would constitute a *de facto* non-compete that would permanently bar Mr. Boykin from practicing his chosen profession.  *See Schlage Lock Co. v. Whyte*, 101 Cal. App. 4th 1443, 1446-47 (2002) (rejecting "inevitable disclosure" theory as "after-the-fact covenant not to compete restricting employee mobility").  To the extent Medtronic seeks to stifle Mr. Boykin's employment based upon this theory, please note that post-employment non-compete agreements have been unequivocally unlawful and against public policy in California since 1872. Specifically, California Business and Professions Code section 16600 provides that "[e]very contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void," and California's robust public policy favoring competition and employee mobility guarantees Mr. Boykin the right to work in California.

## II.   Medtronic's Non-Compete Agreement is Unenforceable in California

California Business and Professions Code section 16600 invalidates *any* contractual restraint on an individual's ability to engage in a trade, business, or profession.  Such post-employment contractual restrictions are unenforceable in California unless one of three statutory exceptions intended to protect goodwill in connection with the sale or dissolution of a business applies.  *Id.*  The California Supreme Court has explained that section 16600 represents California's "settled legislative policy in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008).  Accordingly, California courts have voided contractual non-compete provisions,[1] customer non-solicitation provisions (even those limited in time and geographical scope) where the provision was not necessary to protect the former employer's trade secrets,[2] and provisions restricting a company's customer or former employee from hiring the company's employees (so-called "no hire" provisions).[3]

---

[1] *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 860 (1994) (one year non-compete, purporting to bar at-will employees from providing traffic services  to any television or radio station void and unenforceable); *Latona v. Aetna U.S. Healthcare, Inc.*, 82 F. Supp. 2d 1089, 1093 (C.D. Cal. 1999) (citing *Scott v. Snelling and Snelling, Inc.*, 732 F. Supp. 1034, 1039-40 (N.D. Cal. 1990 ("California courts have repeatedly held that section 16600 should be interpreted as broadly as its language reads")).

[2] *Kolani v. Gluska*, 64 Cal. App. 4th 402, 405 (1998) (provision limiting solicitation of customers in 40-mile radius "an outright prohibition on competition and is void"); *D'Sa v. Playhut, Inc.*, 85 Cal. App. 4th 927, 934 (2001) (non-solicitation provision void except where necessary to protect employer's trade secrets); *Muggill v. The Reuben H. Donnelly Corp.*, 62 Cal. 2d 239, 242 (1965) (holding § 16600 invalidates non-competes, except where necessary to protect trade secrets of employer).

[3] *VL Systems, Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708, 716-17 (2007) ("[I]t is inconsequential whether the



When a California employee is a signatory to a non-compete agreement, California courts have held that the state of California has a materially greater interest in the application of its law because of its long-standing, strong public policy against any restraint on a California employee's mobility.  *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 465–66, 834 P.2d 1148, 1151–52, 11 Cal.Rptr.2d 330, 333–34 (Cal.1992); *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881, 900, 72 Cal.Rptr.2d 73, 85 (1st Dist.1998, review denied); *Scott v. Snelling and Snelling, Inc.*, 732 F.Supp. 1034, 1041 (N.D.Cal.1990). Accordingly, Dexcom is confident that no California court would apply Minnesota law to a former Texas employee now working in California based upon the scant facts alleged in Medtronic's letter.

The facts here also do not support Medtronic's position.  Medtronic does not need to interfere with Mr. Boykin's employment with Dexcom in order to protect its trade secrets.  Given Mr. Boykin's role at Dexcom and Dexcom's instruction to him to not share *any* Medtronic proprietary information with Dexcom, Medtronic cannot and will not establish that its attempt to enforce an unlawful non-compete agreement that invokes Minnesota law is in any way necessary to protect its trade secrets.

Even if Medtronic attempts to enforce the unenforceable non-compete agreement against Mr. Boykin, a California resident, it would face the additional burden of convincing a California court to ignore California's laws and fundamental public policy of protecting employee mobility.  Dexcom is confident Medtronic cannot meet that substantial burden.  Notably, your July 14, 2021 letter indicates that Medtronic has successfully litigated similar issues in California.  To the extent that Medtronic has obtained court orders evidencing its success under similar circumstances, please forward those California court orders to this office so that Dexcom can assess the impact, if any, of such orders on its position.  Until then, it is Dexcom's position that California law prohibits any action against Mr. Boykin based upon the facts alleged in the letter.

### III.   Medtronic's Non-Compete Agreement is Unenforceable in Texas

As you are aware, Mr. Boykin performed his work for Medtronic as a resident of San Antonio, Texas. As such, Medtronic faces the compounding challenge of enforcing its non-complete provision under Texas law as well. Texas has a long-standing jurisprudence of invalidating foreign choice of law provisions held against its residents if the substantive law violates the Texas resident's interests.  *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (explaining that judicial respect for enforcing the contractual expectations of the parties is not unlimited when it comes to choice-of-law agreements because parties "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply"); *see also In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007).

---

restriction is termed a 'no-hire' provision ... or a 'covenant not to compete'... [The company] is not allowed to accomplish by indirection that which it cannot accomplish directly").



Importantly, Texas Business and Commerce Code § 15.50 requires that non-competition agreements against its residents contain reasonable limitations to time, geographic area, and scope of activity as to not impose a greater restraint than is necessary to protect the business interest of the Company.  Under Texas law, absence of a geographical restriction will render a covenant not to compete unreasonable and unenforceable. *D'Onofrio v. Vacation Publications, Incorporated*, C.A.5 (Tex.)2018, 888 F.3d 197.  As you are aware, Mr. Boykin's contract failed to indicate any reasonable geographic area, and on that basis will not be enforceable under Texas law. *See Vais Arms, Inc. v. Vais,* C.A.5 (Tex.)2004, 383 F.3d 287, 72 U.S.P.Q.2d 1214; *Sheline v. Dun & Bradstreet Corp.*, C.A.5 (Tex.)1991, 948 F.2d 174.  Here, Medtronic purported to invoke Minnesota law against a Texas resident in the non-compete agreement signed by Mr. Boykin when he resided in Texas.  Medtronic's position that it can somehow enforce non-competition provisions under Minnesota law against a former Texas employee who now resides in California is untenable.  Dexcom is unaware of any authority that permits such overreaching interference with Mr. Boykin's employment.

Dexcom demands that Medtronic cease further threats of litigation against Mr. Boykin and Dexcom and immediately cease interfering with his current employment at Dexcom. If you have any further questions or additional information, please contact me at your convenience.

Very truly yours,

Brook T. Barnes
California State Bar No. 276667
Texas State Bar No.  24102885

BTB

999999-00902231/5229069.3

procopio.com

PLTFS NOL – 000023

# EXHIBIT 7

PLTFS NOL – 000024

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF ANOKA** | **TENTH JUDICIAL DISTRICT** |

| | |
|---|---|
| Medtronic, Inc. and MiniMed Distribution Corp. | Case Type: Other Contracts<br>Court File No.: _____<br>Judge: _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Charles Boykin and Dexcom, Inc., | |
| Defendants. | |

For their Complaint, Plaintiffs Medtronic, Inc. and MiniMed Distribution Corp. state and allege as follows:

## PARTIES

1.      Plaintiff Medtronic, Inc. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota.

2.      Plaintiff MiniMed Distribution Corp. is a wholly-owned subsidiary of Medtronic Minimed, Inc., which is a wholly-owned subsidiary of Medtronic, Inc.  MiniMed Distribution Corp. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota. MiniMed Distribution Corp. is the employer of the Customer Service Operations Department team for Medtronic, Inc.'s Diabetes business.  Plaintiffs are collectively referred to herein as "Medtronic."

3.      Defendant Charles Boykin ("Boykin") was employed by Medtronic from December 29, 2014 until his employment was terminated effective January 2, 2021.  During the entirety of his employment with Medtronic, Boykin was a resident of the State of Texas.  He currently resides in the State of California.

4.      Defendant Dexcom, Inc. ("Dexcom") is a Delaware corporation with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

5.      Medtronic and Boykin are parties to a Medtronic Employee Agreement executed by Boykin on or about March 4, 2020 for good and valuable consideration ("Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated by reference herein.

6.      Section 7 of the Agreement provides that it is governed by Minnesota law, that Boykin consents to the personal jurisdiction of the state courts in the State of Minnesota, that any dispute arising out of or related to the Agreement "shall be exclusively decided by a state court in the State of Minnesota," that Boykin irrevocably waives the right to have any dispute arising out of or related to the Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota, and that Boykin irrevocably waives the right to have the laws of any other state applied to the interpretation of the Agreement. (Agreement § 7.)

7.      Dexcom is subject to personal jurisdiction in the State of Minnesota because, among other reasons, it transacts business in the State, and it was reasonably foreseeable that it would be bound by the Agreement's forum-selection clause when it hired Boykin and thereby induced Boykin's breach of the Agreement, causing harm to Medtronic in the State of Minnesota.

## BACKGROUND

### Medtronic's Business

8.      Medtronic is a global healthcare solutions company committed to improving lives through medical technologies and services. Medtronic's business is organized into 20 Operating Units that each focus on a narrow disease state or specialty physician type. One of these Operating Units is the Diabetes Operating Unit.

2

PLTFS NOL – 000026

9.      The Diabetes Operating Unit is supported by its Customer Service Operations Department.   The Customer Service Operations Department provides support services for Medtronic Diabetes products, including its line of MiniMed™ insulin pump systems ("Insulin Pump Systems"), Guardian™ Connect continuous glucose monitoring system ("Guardian™ Connect System"), and other Diabetes management products.   Because of the ongoing nature of Diabetes management and use of Diabetes management products, support services are an integral part of the customer experience and the ability to capture market share.

10.     Medtronic's Guardian™ Connect System is a significant driver of revenue and customer engagement within the Diabetes Operating Unit.

### Boykin's Employment with Medtronic

11.     Boykin began working for Medtronic on December 29, 2014 as a Senior Customer Service Manager in the Diabetes Operating Unit.   As Senior Customer Service Manager, Boykin was a process expert, responsible for leading Medtronic's Shared Services teams in the execution of their support services related to Medtronic Diabetes products.   His job duties encompassed all Shared Services functions, including but not limited to technical support, call center management, and back-office support, such as Solutions—receiving customer complaints and loading them into the system for review—and Patient Outreach—coordinating outgoing customer contact as a result of recalls, reports of a customer with ongoing or repeat issues, or customer data that raises technical support or customer service concerns.

12.     In his senior customer service role, Boykin was charged with alignment of Medtronic's customer service processes and its overall business strategies and goals.   For instance, some of the goals outlined in Boykin's April 2020 performance and development summary included creating new business models; driving patient loyalty through customer focused training and ongoing product training to representatives; leading technically and clinically, including

PLTFS NOL – 000027

supporting product launches and clinical studies and executing projects designed to improve representative product knowledge; and driving reductions in product returns and reducing escalations.

13. Boykin was also embedded in every key division of Medtronic's Diabetes Operating Unit, which granted him access to significant confidential and proprietary information. He was a conduit between the Customer Service Operations Department and the Research and Development, Quality, and Regulatory teams. Boykin facilitated technical support related to federal Food and Drug Administration audits and reports as well as Medtronic clinical trials. He thus had in-depth knowledge of Medtronic's Diabetes Operating Unit research and development and the product pipeline. Indeed, Boykin's knowledge exceeded the knowledge of most, if not all, other non-engineering employees within the Diabetes Operating Unit.

14. Boykin also had a wealth of knowledge as to Medtronic's current suite of Diabetes management products, all their strengths and defects, and related customer service. He built customer service processes based on individual Medtronic products, including troubleshooting guides and employee training, to enhance Medtronic's 24/7, 365-days-a-year customer service model. He was also intimately familiar with the nature and volume of customer complaints received by Medtronic, the information collected for and resulting from Food and Drug Administration audits, and ongoing staffing and customer support deficiencies and initiatives. Simply put, Boykin is a Medtronic and Diabetes customer service subject matter expert.

15. Boykin also assisted Medtronic through several key customer service initiatives during his employment. Medtronic's Customer Service Operations Department operates globally. Until several years ago, the Medtronic Technical Support team used technical support vendor Teleperformance, which provided technical support through Teleperformance's Manila office in

4

the Philippines.  Between 2018 and 2020, Medtronic transitioned its Manila technical support operations to a customer support center operated by Medtronic directly.  The transition was an expansion of Medtronic's United States call center operations and involved implementing established customer service processes as well as adapting those processes to a new environment and incorporating new ones as needed.  Boykin was one of several individuals who managed the expansion.  He led the United States and Manila Technical Support teams, all of whom reported up to him, to enhance continuity and collaboration; managed the budget; worked with Manila on staffing and training initiatives; and otherwise ensured that the expansion was properly executed.

16.    Boykin was also involved in coordinating the launch of Medtronic's Guardian™ Connect System and related support services in 2018. Because of the volume of customer calls regarding Medtronic's Guardian™ Connect System, the management and provision of support services related to the Guardian™ Connect System were an integral part of Boykin's role.

17.    In order for Boykin to effectively carry out the abovementioned responsibilities, Medtronic provided Boykin with significant amounts of confidential and proprietary information, including information regarding Medtronic's quality assurance processes, research and development relating to new products and how to support them, detailed information regarding Medtronic product performance, complaint volumes, complaint data, processes for addressing patient questions and complaints, troubleshooting guidelines, technical support processes for products, optimization processes, and FDA audit information.

18.    Medtronic devotes substantial resources towards developing confidential business information for its Customer Service Operations Department to use in supporting Medtronic's Diabetes devices.  Boykin had access to and contributed to this confidential information as a member and leader within the Customer Service Operations Department.

PLTFS NOL – 000029

19.     The confidential information Medtronic provided to Boykin will remain confidential for at least two years and derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, Medtronic's competitors, who could obtain value from its disclosure or use.

20.     Medtronic uses reasonable efforts to protect the secrecy of its confidential information, including by using confidentiality, non-compete, and non-solicitation covenants in employee agreements and restricting access to confidential information through use of passwords and other means.

### Boykin's Employee Agreement with Medtronic

21.     On February 26, 2020, Medtronic offered Boykin a substantial increase in compensation that Medtronic was not obligated to offer him.  Medtronic's offer of a substantial increase in compensation was conditioned on Boykin's execution of a Medtronic Employee Agreement.

22.     In relevant part, the offer letter stated:

> As a condition of, and in consideration for, this offer, you must sign the Medtronic Employee Agreement.  The Employee Agreement ensures that Medtronic's confidential business and product information, inventions, and customer relationships are protected by updated employee confidentiality and non-compete obligations. . . . A copy of the Agreement is attached.  This offer is conditional upon you signing and returning the attached Employee Agreement upon acceptance.

23.     On March 4, 2020, Boykin accepted Medtronic's offer of a substantial increase in compensation and in consideration thereof signed the Medtronic Employee Agreement, which was in effect at the time of his termination. (*See* Ex. A.)  At the time Boykin signed the Agreement and for the duration of his employment with Medtronic, he was a resident of and worked in San Antonio, Texas.

6

24.    In the Agreement, Boykin agreed to abide by limited restrictions on competing with

Medtronic, as follows:

**4.1    Restrictions on Competition.** Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

(Ex. A, § 4.1.)

25.    Boykin further agreed to abide by restrictions on use or disclosure of Medtronic's

confidential information, as follows:

**3.6  Nondisclosure of CONFIDENTIAL INFORMATION.** Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after employment, for as long as the information retains the characteristics described in Section 1.3. Employee further agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services. This provision is intended to govern any disclosure outside of MEDTRONIC.

26.    The Agreement contains the following definitions:

**1.1 COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

**1.2 COMPETITIVE RESEARCH AND SUPPORT** means any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulator or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design,

7

production, manufacture, marketing, promotion, sale, support or service or a COMPETITIVE PRODUCT.

**1.3 CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

**1.4 CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

**1.8 MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or

PLTFS NOL – 000032

product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

(*Id.* §§ 1.1, 1.2, 1.3, 1.4, 1.8.)

27.     The noncompete and confidentiality provisions work together to ensure that employees who are provided with and/or help contribute to Medtronic Confidential Information during the course of their employment do not provide services to competitors for two years post-employment with Medtronic or otherwise use or disclose Medtronic's Confidential Information.

28.     Section 8.8 of the Agreement provides that "[i]n the event Employee breaches or violates Sections 4.1, 4.2, or 4.3 hereinabove, the duration of the restrictions contained therein shall be extended by the number of days the Employee remains in breach or violation thereof. *This provision may be specifically enforced*." (Emphasis added.)

29.     On or about March 4, 2020, Boykin also signed a Retention Incentive Agreement. A true and correct copy of the Retention Incentive Agreement is attached hereto as Exhibit B and incorporated by reference herein.

30.     The Retention Incentive Agreement provided for a lump-sum payment of $15,000 to be paid to Boykin as a retention incentive following execution of both the Retention Incentive Agreement and the Agreement. In order to retain the retention incentive, Boykin was required to remain continuously and actively employed with Medtronic until March 20, 2021. Under Section 2 of the Retention Incentive Agreement, Boykin agreed to immediately repay the entire retention incentive amount if he was terminated for "Cause" before March 20, 2021. (*See id.* § 2(b).) As defined in the Retention Incentive Agreement, "Cause" includes "violation of any Medtronic corporate or business policy as provided by the standards of the applicable policy, including but not limited to, Medtronic's Code of Conduct, Medtronic's Sexual Harassment and Offensive Conduct Policy, [or] Medtronic's Business Conduct Standards." (*Id.* § 2(a).)

9

**Boykin is Terminated for Fraudulent Expense Reporting Activity**

31.     In November 2020, an audit revealed that Boykin had been improperly using his Medtronic corporate credit card and fraudulently reporting expenses. Boykin was placed on paid administrative leave while an extensive investigation was conducted.

32.     The investigation concluded in December 2020. The investigation revealed that Boykin had been submitting expense reports since December 2016 wherein he fraudulently claimed non-reimbursable personal expenses as reimbursable business expenses. In particular, Boykin had sought reimbursement for gift cards, lodging and car rental expenses, first-class upgrades, meals, and a "team-building event" that were not business expenses.

33.     Medtronic's Expense Reimbursement Policy states that gift cards of any amount are non-reimbursable expense. For this reason alone, Boykin's expense reports seeking reimbursement of gift card expenses are improper. However, Boykin's expense reports seeking reimbursement of gift card expenses posed additional concerns. Specifically:

> a.      From 2016 to 2019, there were 112 instances where there were discrepancies between the number of gift cards listed on itemized receipts and the number of recipients listed on Boykin's expense reports. For example, on December 9, 2020, Boykin purchased two $300 gift cards from CVS; however, he documented in his expense report that he purchased six $100 gift cards and provided them to six employees. Additionally, in many of Boykin's expense reports, he did not document the employee names who received gift cards.

> b.      In February and March 2020, overtime incentive gift cards were provided to 24 Hour Technical Support employees. According to Medtronic records, as confirmed by a Product Support Supervisor, in February 2020 Boykin should have incurred $1,550 on his Medtronic AMEX to purchase gift cards for employees who earned gift cards; however, for February 2020, he submitted and was reimbursed for $4,000 of gift card expenses incurred on his Medtronic AMEX. Further, it was confirmed that in March 2020, Boykin should not have incurred any gift card incentive expenses at all; however, for March 2020, he submitted and was reimbursed for $1,300 of gift card expenses incurred on his Medtronic AMEX.

34.     Notably, Boykin last attempted to submit fraudulent gift card expenses for reimbursement in August 2020, but he paid the expenses himself when he was confronted about

PLTFS NOL – 000034

them.   That month, Boykin had incurred $950 of gift card expenses.   An audit identified discrepancies due to the itemized receipt showing the purchase of one $500 gift card and one $450 gift card, whereas Boykin had listed 10 recipients who he claimed received $100 gift cards for "capa work."   After Boykin was informed that gift card expenses were not reimbursable, he resubmitted the expenses as personal/non-reimbursable and reimbursed AMEX directly.   Two employees who were documented as recipients were contacted and both denied receiving a gift card of any amount.   Additionally, one of the employees provided details of the CAPA project where it was stated that Medtronic Recognize! points were provided as an employee reward, not gift cards.

35.    As to the other instances of gift card expense reporting, Boykin stated that the discrepancies between the itemized receipts and expense reports arose because he had purchased packs of gift cards for the same activation fee as a single gift card.   However, the itemized receipts showed that Boykin routinely purchased gift cards that allowed a range of $20 to $500 to be placed on them at one time.   Additionally, each transaction had an activation fee that was typically $4.95 or $5.95, and a review of gift card packs from multiple online merchants showed that activation fees increased as more cards were included in the pack.   For example, a pack of three $25 VISA gift cards have an $8.95 activation fee and a pack of three $50 MasterCard gift cards have a $9.95 activation fee.   The review was unable to identify the availability of any packs of five $100 VISA gift cards, which Boykin routinely documented as purchasing in his expense reports.

36.    In addition to the gift cards, Boykin was sought and received reimbursement for the following personal expenses he disguised as business expenses:

a.    On March 14, 2020, Boykin's Medtronic AMEX incurred $1,147.67 at a Days Inn in Destin, Florida, and Boykin submitted it as a non-reimbursable personal expense.   Subsequently, Boykin manually created an out-of-pocket expense dated April 21, 2020 totaling the exact same amount and falsely claimed that it was for Bogota,

PLTFS NOL – 000035

Colombia lodging expenses he incurred for a colleague.  The colleague who traveled to Colombia has a Medtronic AMEX and she incurred her own expenses related to Colombia and submitted them in her own expense reports.

b.      On March 23, 2020, Boykin's Medtronic AMEX incurred $176.56 at an Embassy Suites in Tuscaloosa, Alabama, and Boykin submitted it as a non-reimbursable personal expense.  Subsequently, Boykin created an out-of-pocket expense dated April 17, 2020 totaling the exact same amount and falsely claimed that it was for Bogota, Colombia lodging expenses for a colleague.  Additionally, the itemized folio submitted for the out-of-pocket expense was manipulated so that "Embassy Suites by Bogota Rosales" was transcribed on the header; however, the bottom of the hotel folio states, "Welcome to the Embassy Suites Tuscaloosa Downtown."

c.      On March 19 and 23, 2019, Boykin's Medtronic AMEX incurred $702 of car rental expenses from the San Antonio Airport and he falsely submitted them as business expenses for his colleague's Bogota, Colombia travel.  Boykin's car rental was for a personal trip to Tuscaloosa, Alabama to pick up his son from college.

d.      In November 2019, while traveling to and from Minneapolis, Minnesota for job interviews, Boykin falsified a dinner expense during a layover at the Denver airport and a breakfast expense at the Minneapolis Airport on a Sunday totaling $116.86.  For each expense, the merchant details were removed from the notes field of his expense report and he documented that he was interviewing with Minneapolis employees.

e.      In April 2019, Boykin's Medtronic AMEX incurred $258 for first-class upgrades for him and his spouse; however, he disguised them as baggage fees related to traveling to Mounds View, Minnesota.

f.      In September 2017, Boykin's Medtronic AMEX incurred $407.70 for a water event that took place at a marina, and he submitted it as a team building event for 10 total employees.  Boykin's supervisor was informed of the expense by his administrative assistant, who found the expense unusual, and Boykin provided his supervisor with what seemed to be a reasonable explanation.  Boykin's administrative assistant, who was listed as a guest at the event and would have been the one to book the event, does not have knowledge that the event took place nor did she attend the event.  Three other employees who were documented as guests similarly denied being present or having knowledge that the event took place.

37.      Medtronic relied on Boykin's expense reports and reimbursed Boykin for these fraudulent expenses.  Medtronic's total exposure related to the fraudulent expense reports is $70,609.16, as detailed in a letter to Boykin, attached as Exhibit C and incorporated by reference herein.

38.     In fraudulently reporting his expenses, Boykin violated Medtronic's Global Travel Policy, U.S. Expense Reimbursement Policy, Corporate Credit Card Policy, and Code of Conduct. These are Medtronic corporate or business policies as defined in the Retention Incentive Agreement.

39.     Based on the findings of the investigation, the decision was made to terminate Boykin's employment for Cause.

40.     Boykin was terminated for Cause on December 17, 2020, effective January 2, 2021.

41.     Medtronic Senior Employee Relations Partner Rebecca Garza ("Garza") contacted Boykin soon after his termination about repayment of the funds.  She also emailed Boykin on January 20, 2021 requesting that they schedule a phone call to review repayment details.

42.     Although Boykin responded to Garza by email, he failed to provide any substantive answers regarding repayment and repeatedly delayed a phone call with Garza due to alleged time constraints and scheduling conflicts.

43.     Medtronic sought repayment of the fraudulent expenses in a letter dated February 17, 2021.  (Ex. C.)  The letter included detailed accountings of the fraudulent expenses and requested a response or payment by March 12, 2021.

44.     Medtronic followed up on repayment of the fraudulent expenses in a second letter to Boykin dated July 9, 2021.  Because Boykin was terminated for Cause prior to March 20, 2021, the letter also included a request for repayment of the $15,000 retention incentive paid to Boykin in March 2020, as provided for in the Retention Incentive Agreement.  The letter requested a response or payment within ten (10) days.

45.     Boykin has not entered into a repayment plan with Medtronic or otherwise indicated that he intends to repay these amounts.  These amounts remain due and owing.

PLTFS NOL – 000037

### Boykin Obtains Employment With Dexcom, a Medtronic Competitor

46.     Dexcom is one of Medtronic's major competitors in the Diabetes market, and Medtronic's primary competitor in the continuous glucose monitoring market.   Medtronic competes with Dexcom throughout the United States in the marketing, sale, and support of Diabetes products and services.

47.     In particular, Dexcom's own continuous glucose monitoring system, the Dexcom G6 CGM System, directly competes with Medtronic's Guardian™ Connect System.   On information and belief, the Dexcom G6 CGM System is Dexcom's principal product, and the support services related to the Dexcom G6 CGM System are the primary focus of Dexcom's technical support operations.

48.     On April 9, 2021, Medtronic Human Resources Director Wilma Carmona ("Carmona") received a notification on the professional networking website LinkedIn which said: "Congratulate Charles 'Chuck' for starting a new position as Senior Director Global Technical Support at Dexcom."   No one at Medtronic had any prior knowledge or notice that Boykin was pursuing or had accepted this position.

49.     In Section 4.3 of the Agreement, Boykin agreed to the following:

> In the event Employee's employment with MEDTRONIC terminates, Employee agrees that during the term of the restrictions described in Section 4.1, Employee will immediately inform MEDTRONIC if Employee has accepted an offer of employment from any new employer, and shall immediately disclose to MEDTRONIC in writing the entity of any new employer, the job title of Employee's new position, and a description of any services to be rendered to that employer.   In addition, Employee agrees to respond within ten (10) days to any written request from MEDTRONIC for further information concerning Employee's work activities sufficient to provide MEDTRONIC with assurances that Employee is not violating any of the obligations Employee has undertaken in this Agreement.

PLTFS NOL – 000038

50.     On information and belief, Boykin was hired by Dexcom on February 22, 2021 as Senior Director of Dexcom's global technical support operations.  In that role, he is performing nearly identical services to those he performed at Medtronic as Senior Customer Service Manager.

51.     On his LinkedIn profile, Boykin writes that he "[o]versees all strategic and tactical aspects of change management for projects, initiatives and organizational transformation. Oversees process improvements and/or Voice of the Customer functions for an assigned line of business, business partnership or staff area."

52.     And in the job description which, on information and belief, was posted by Dexcom to seek applicants for Boykin's role as Senior Director Global Technical Support, the responsibilities named by Dexcom directly overlap with Boykin's responsibilities at Medtronic, including, for example:

- The individual must work cross functionally to achieve objectives and be comfortable working in a matrixed organization.
- Supervises representatives that are answering customer inquiries, primarily over the telephone, e-mail, or facsimile.
- Establishes and maintains systems that provide answers to common questions or problems.
- Reports new or recurring problems to design departments.
- Ensures representatives are properly trained when old products are upgraded or new products are released.
- Selects, develops, and evaluates personnel to ensure the efficient operation of the function.
- Works closely with GBS leadership in establishing complementary goals that support both the Tech Support function and GBS objectives.
- Must be able to work effectively in a matrix organization as part of the shared services model.
- Responsible for establishing, monitoring, and setting targets for key KPI's related to customer satisfaction and efficiency.
- When deficiencies are identified, responsible for establishing and implementing applicable improvement plans.
- Responsible for interviewing, hiring, and training employees; planning, assigning, and directing work; appraising performance; rewarding and disciplining employees; addressing complaints and resolving problems.

PLTFS NOL – 000039

53.     Moreover, the job description includes responsibilities that implicitly involve direct application of the confidential and proprietary information that Boykin acquired with Medtronic as to the customer service and support processes it developed at significant time and expense. These include:

- They will develop and execute the global technical support strategy that focuses on using technology and people to best meet our patients' needs.
- Responsible for working collaboratively in establishing, ramping up, and sustaining global Tech Support functions in both shared service and direct report situations.
- Responsible for selecting and implementing technology solutions that meet customer needs.
- Must work with local leadership to support local requirements, preferences, and norms for scheduling.
- Responsible for forecasting and establishment of headcount requirements.
- Responsible for identifying, evaluating, choosing and supporting 3rd party contact centers used to supplement Dexcom Tech Support resources.
- May sponsor and/or lead key initiatives in support of meeting and exceeding customer expectations.
- Responsible for managing global training programs to ensure training is facilitated and executed in line with global and localized requirements.
- Responsible for managing global budget including significant spend at 3rd party contact centers.
- Works with R&D to escalate customer issues to ensure timely resolution when Tech Support personnel are not able to resolve patient issues.
- Provides input to R&D and Marketing based on customer experience.

54.     Even Boykin has acknowledged that the information he has acquired with Medtronic as to its customer service and support processes provides him a professional benefit. He writes on his LinkedIn profile: "Chuck has helped deliver total cost savings employing continuous improvement, lean manufacturing and best practice methodologies across supply chain management, operations, customer relationship, call center functions, quality and administrative services. Lead efforts to increase product/customer quality redesigns, while reducing costs across multiple business segments. Ability to enhance staff performance through training and rollout of best practice processes, tools and techniques leading to increased employee retention and savings. Has a proven success record and high degree of success in improving contact center performance,

16

PLTFS NOL – 000040

while striking a balance between cost, revenue and customer satisfaction. He has led teams focused on regulatory compliance to include FDA, CMS, OSHA, and State/Local governing agencies."

55.     This confidential and proprietary information would provide a strategic and unfair advantage to Dexcom. On information and belief, the perception in the market is that Medtronic outperforms Dexcom as to technical support and customer service. A notable improvement in Dexcom's technical support and customer service as a result of the confidential and proprietary information Boykin acquired at Medtronic would give Dexcom a strategic and unfair advantage in the continuous glucose monitoring market.

56.     Further, Dexcom uses the same technical support vendor that Medtronic previously had—Teleperformance. Boykin had in-depth knowledge and proficiency in dealing with Teleperformance as a result of his employment with Medtronic. The acquisition of an employee with significant experience with Teleperformance and leadership of efforts to enhance continuity and collaboration between United States and Teleperformance teams would greatly improve Dexcom's provision of support services related to the Dexcom G6 CGM System. More importantly, however, Boykin was actively involved in Medtronic's development of a better technical support solution exclusively for Medtronic, which replaced Medtronic's use of Teleperformance.

57.     If Boykin is allowed to continue violating Sections 3.6 and 4.1 of the Agreement by providing services to Dexcom, he will be able to use Medtronic's Confidential Information to compete unfairly with Medtronic and assist Dexcom in the development of similar customer support processes and technical support solutions based upon Medtronic's Confidential Information.

PLTFS NOL – 000041

58.     Boykin's violations of his noncompete and confidentiality obligations are likely to cause Medtronic substantial harm that could not be readily quantified or fully compensated monetarily. Medtronic would never know for certain what Confidential Information Boykin is using to compete against Medtronic, and it would be extremely difficult, if not impossible, to quantify the harm to Medtronic's business. The loss of business would not be limited to the duration of Boykin's noncompete covenant, but could continue indefinitely.

### Medtronic's Efforts to Resolve this Matter

59.     On April 20, 2021, Medtronic sent a letter to Boykin via Federal Express, with Dexcom copied, reminding Boykin of his post-employment obligations to Medtronic, including the noncompete obligations contained in Section 4.1 and the confidentiality obligations in Section 3.6. A copy of the Agreement was attached. Medtronic explained that Boykin's employment with Dexcom posed compliance concerns, and requested assurances from Boykin as to his position and responsibilities with Dexcom, that he had returned all Medtronic property and Confidential Information, and that he had access to Medtronic Confidential Information and may not use or disclose it for the benefit of any third party or use, disclose, or rely on it in the discharge of his duties on behalf of Dexcom.

60.     In a short response letter dated April 22, 2021, Boykin wrote:

Job Role: Sr. Director.

Duties: Lead Call Center function for Dexcom.

Start Date: 2/22/2021

I have returned all Medtronic property and materials.

I have not disclosed and do not intend to disclose any Medtronic Confidential Information to any company or 3rd party.

18

The response letter was sent to Medtronic via UPS. Because many Medtronic employees were working remotely due to the COVID-19 pandemic, Medtronic did not receive Boykin's response letter until June 11, 2021.

61.     Among other deficiencies, Boykin failed to address his violation of the noncompete obligations contained in Section 4.1 as well as his potential use of or reliance on Medtronic Confidential Information in his role with Dexcom.

62.     On May 21, 2021, Medtronic followed up with a letter to Dexcom via Federal Express. The letter reiterated that Medtronic remained very concerned about Boykin's ability to comply with his noncompete and confidentiality obligations under the Agreement while working for Dexcom. The letter requested further assurances from Dexcom.

63.     Dexcom responded by email over a month later on July 1, 2021, claiming that Boykin had been instructed not to share Medtronic's proprietary information and that Boykin had confirmed that he had not and would not disclose Medtronic's confidential information to Dexcom.

64.     As with Boykin's April 22, 2021 response, Dexcom's response failed to address Boykin's violation of the noncompete obligations contained in Section 4.1 as well as his potential use of or reliance on Medtronic Confidential Information in his role with Dexcom.

65.     On July 14, 2021, Medtronic sent letters via Federal Express to Boykin and via email to Dexcom again requesting assurances that Boykin had not violated the Agreement and would not do so in the course of his employment with Dexcom. In its letter to Boykin, Medtronic reiterated that it believed Boykin to be in violation of his noncompete and confidentiality obligations under the Agreement. It also explained that it disputed his claim that he had returned all Medtronic property, when he had not yet begun to repay either the fraudulent expenses or his retention incentive, both of which remain outstanding debts owed to Medtronic. In its letter to

19

Dexcom, Medtronic provided further explanation of Boykin's nearly identical job responsibilities in his roles with Medtronic and Dexcom.  Medtronic also explained the kinds of Confidential Information that Boykin gained during his employment with Medtronic that could be used to unfairly benefit Dexcom.

66.     When Medtronic did not hear back from Boykin and Dexcom, Medtronic followed up once again with Dexcom's General Counsel to determine if Dexcom planned to addressed Medtronic's concerns.

67.     Neither Boykin nor Dexcom responded to these letters or emails.

68.     Boykin remains employed by Dexcom.

69.     Boykin's employment with Dexcom violates Sections 3.6 and 4.1 of the Agreement for the reasons described above, and the Agreement is enforceable against Boykin.  Medtronic, Boykin, and Dexcom were unable to reach resolution of this matter.

## CAUSES OF ACTION

### COUNT ONE
**(Against Boykin for Breach of Contract – Medtronic Employee Agreement)**

70.     Medtronic repeats and realleges each and every allegation contained in paragraphs 1 through 69 hereinabove.

71.     Boykin and Medtronic are parties to the Agreement, a true and correct copy of which is attached hereto as Exhibit A.

72.     Medtronic complied at all times with its contractual obligations under the Agreement.

73.     In consideration for an increase in compensation and other good and valuable consideration, Boykin agreed to the noncompete and confidentiality obligations in the Agreement, creating a binding and lawful contract.

PLTFS NOL – 000044

74.     Boykin has breached the Agreement by, among other things, being employed by or performing services for Dexcom in connection with or relating to a Competitive Product or Competitive Research and Support before the expiration of two years from the last day of his Medtronic employment.  Boykin has further breached the Agreement by using and/or disclosing Medtronic's Confidential Information for the benefit of Dexcom and rendering services to Dexcom during the course of which he is using, disclosing, relying upon, or is being induced or required to use, disclose, or rely upon, Medtronic's Confidential Information.

75.     Medtronic lacks an adequate remedy at law for Boykin's breach of the Agreement, which threatens Medtronic with irreparable harm.

76.     By reason of the foregoing, Medtronic is entitled to damages and injunctive relief restraining Boykin further violating the Agreement.

## COUNT TWO
### (Against Boykin for Breach of Contract – Retention Incentive Agreement)

77.     Medtronic repeats and realleges each and every allegation contained in paragraphs 1 through 76 hereinabove.

78.     Boykin and Medtronic are parties to the Retention Incentive Agreement, a true and correct copy of which is attached hereto as Exhibit B.

79.     Medtronic complied at all times with its contractual obligations under the Retention Incentive Agreement.

80.     In order to retain the retention incentive, Boykin was required to remain continuously and actively employed with Medtronic through March 20, 2021.  He did not do so, as he was terminated for Cause, as that word is defined in the Retention Incentive Agreement, effective January 2, 2021.  Under the Retention Incentive Agreement, Boykin is obligated to repay the entire retention incentive.

21

81.    Boykin has breached the Agreement by failing to repay the retention incentive.

82.    By reason of the foregoing, Medtronic is entitled to damages in an amount to be proven at trial, including as described within this Complaint.

## **COUNT THREE**
### **(Against Boykin for Fraudulent Misrepresentation)**

83.    Medtronic repeats and realleges each and every allegation contained in paragraphs 1 through 82 hereinabove.

84.    Boykin made false representations of his reimbursable expenses when he submitted expense reports wherein he claimed non-reimbursable personal expenses as reimbursable business expenses.

85.    On information and belief, Boykin knew when he was submitting the expense reports that the reports falsely claimed non-reimbursable personal expenses as reimbursable business expenses or were an intentional misrepresentation of his expenses.

86.    On information and belief, Boykin submitted the expense reports wherein he claimed non-reimbursable personal expenses as reimbursable business expenses with the intent that Medtronic would rely on them and reimburse him.

87.    Medtronic reasonably relied on Boykin's expense reports in reimbursing him for the fraudulently claimed non-reimbursable personal expenses.

88.    Medtronic suffered harm as a result of its reliance on Boykin's fraudulent expense reports, including total exposure in the amount of $70,609.16.

89.    Despite Medtronic's efforts, Boykin has refused to repay any amount associated with the fraudulent expense reports.

90.    By reason of the foregoing, Medtronic is entitled to damages in an amount to be proven at trial, including as described within this Complaint.

PLTFS NOL – 000046

## COUNT FOUR
### (Against Dexcom for Tortious Interference with Contract)

91.     Medtronic repeats and realleges each and every allegation contained in paragraphs 1 through 90 hereinabove.

92.     Boykin agreed to the terms of the Agreement, including the noncompete and confidentiality obligations contained therein, which Agreement is valid and enforceable.

93.     Dexcom is not a party to the Agreement.

94.     Dexcom has intentionally procured Boykin's breach of the Agreement, without justification, by employing him to provide services on its behalf that violate the Agreement, with knowledge of the Agreement.

95.     Dexcom's interference with the Agreement has caused Medtronic injury, including without limitation lost profits and the attorneys' fees Medtronic has incurred to enforce its rights under the Agreement.

96.     Medtronic lacks an adequate remedy at law for Dexcom's continuing breach of the Agreement, which threatens Medtronic with irreparable harm, including injury to Medtronic's Confidential Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Medtronic, Inc., and MiniMed Distribution Corp. pray for a judgment in their favor and against Defendants, and each of them, jointly and severally, as follows:

A.     During the pendency of this action and until further Order of this Court, temporarily restraining and enjoining Boykin from breaching the Employee Agreement.

PLTFS NOL – 000047

B.      During the pendency of this action and until further Order of this Court, temporarily restraining and enjoining Dexcom from tortiously interfering with the Employee Agreement by employing Boykin in violation thereof and by permitting him to breach the terms thereof.

C.      Permanently restraining and enjoining Boykin from breaching the noncompete obligations within the Employee Agreement until January 2, 2023 and by specifically enforcing Section 8.8 of the Employee Agreement by extending the duration of the permanent injunction beyond January 2, 2023 by the number of days Boykin was in breach of Section 4.1 of the Employee Agreement.

D.      Permanently restraining and enjoining Medtronic from tortiously interfering with the Employee Agreement by employing him in violation of the permanent injunction requested in Paragraph C of this Prayer for Relief.

E.      Awarding Medtronic its damages caused by Defendants' wrongful conduct in an amount greater than $50,000.

F.      Awarding Medtronic an accounting and a constructive trust on all profits received by Defendants as a result of their unfair competition.

G.      Awarding Medtronic its reasonable attorneys' fees, interest, costs, and disbursements to the fullest extent permitted by law, including such attorneys' fees as may be available to it as damages pursuant to the decision of the Minnesota Supreme Court in *Kallok v. Medtronic*, 573 N.W.2d 356 (Minn. 1998).

H.      Awarding Medtronic such other, further, or different relief as the Court may deem just and equitable.

H.      Awarding Medtronic its reasonable attorneys' fees, interest, costs, and disbursements to the fullest extent permitted by law.

PLTFS NOL – 000048

I.     Awarding Medtronic such other, further, or different relief as the Court may deem just and equitable.

Dated: September 7, 2021

*s/ Teresa M. Thompson*
Teresa M. Thompson (#0248940)
Melissa R. Hodge (#0400800)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Telephone: 612.492.7000
Email: tthompson@fredlaw.com
     mhodge@fredlaw.com

*Attorneys for Plaintiffs*

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minnesota Statute § 549.211, subdivision 3, to the party against whom the allegations in this motion are asserted.

*s/ Teresa M. Thompson*
Teresa M. Thompson

PLTFS NOL – 000049

**Medtronic**  

# EMPLOYEE AGREEMENT

## INTRODUCTION

Medtronic and the undersigned Employee recognize it is important that Medtronic protect its rights with respect to its confidential business and product information, inventions, and customer relationships without unduly impairing the Employee's ability to pursue his/her profession.  Medtronic and the Employee also recognize that Medtronic provides valuable training to Employee, entrusts Employee with confidential information, business and customer relationships and goodwill, and compensates Employee to support, develop, administer, maintain, promote, market and/or sell Medtronic products.

Accordingly, Employee enters into this Agreement in consideration for one or more of the following: (i) Medtronic's offer of employment or continuing employment and the benefits associated with that employment; (ii) Medtronic's promise of granting Employee access to confidential information necessary to perform Employee's duties; (iii) Medtronic's actual grant to Employee of access to confidential information necessary to perform the Employee's duties; (iv) Medtronic's promise to provide Employee valuable training, (v) Medtronic's actual provision of training to Employee; (vi) Medtronic's promise to provide Employee access to Medtronic's business and customer relationships and goodwill; (vii) Medtronic's actual provision to Employee of access to Medtronic's business and customer relationships and goodwill; (viii) Medtronic's obligations to the Employee contained in this Agreement; (ix) or other consideration which the Employee acknowledges was received and was sufficient consideration for the promises in this Agreement.

## SECTION 1:  DEFINITIONS

**PLEASE NOTE:  Terms that are CAPITALIZED have the following defined meaning whenever used in this Agreement:**

1.1 **COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

1.2 **COMPETITIVE RESEARCH AND SUPPORT** means any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulatory or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT.

1.3 **CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.   CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical

EXHIBIT A

investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

1.4 **CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

1.5 **INVENTION(S)** means any and all inventions, discoveries, ideas, processes, writings, works of authorship, designs, developments and improvements, whether or not protectable under the applicable patent, trademark or copyright statutes, generated, conceived or reduced to practice by the Employee, alone or in conjunction with others, while employed by MEDTRONIC.

1.6 **MEDTRONIC** means Medtronic plc, and each and all entities wherever located that are directly or indirectly wholly or partly owned or controlled by, or that are directly or indirectly under the common control or ownership of, Medtronic plc, including but not limited to all of Medtronic plc's direct and indirect subsidiary, parent, sibling entities, and affiliates, and each of their respective direct and indirect subsidiary, parent, sibling entities, and affiliates, and each of their respective successors and assigns, that exist now or in the future.

1.7 **MEDTRONIC CUSTOMER(S)** means any person, entity or institution, including the employees, agents or representatives thereof, who controlled, directed or influenced the purchasing decisions of any such person, entity or institution, to whom or to which Employee sold, negotiated the sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC.

1.8 **MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

## SECTION 2: EMPLOYMENT

2.1 **Employment At-Will.** MEDTRONIC agrees to employ or continue to employ Employee at-will. The parties agree that either party may terminate Employee's employment at any time for any reason. This Agreement is ancillary to at-will employment and does not purport to include all of the terms

PLTFS NOL – 000051

of, or supersede, that relationship.  This Section 2.1 does not apply if Employee and MEDTRONIC are parties to an existing written term employment agreement.

**2.2   Compensation.**  The compensation, benefits, and other financial terms and conditions applicable to Employee's employment at the inception of this Agreement are set forth in separate documents provided to Employee.  Any changes in the compensation and/or benefits of Employee after this Agreement becomes effective shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

**2.3   Duties.**  Employee agrees to devote Employee's full working time and attention to diligently, loyally and faithfully performing and discharging the duties assigned to Employee from time to time, and all duties associated therewith, to engage in no activities detrimental to MEDTRONIC's interests, to be employed by or represent no other persons or entities in the same or similar business as MEDTRONIC while employed by MEDTRONIC, to be familiar with MEDTRONIC policies that relate to Employee's duties, and to abide by MEDTRONIC's policies as they exist from time to time, including, without limitation, MEDTRONIC's policies regarding Code of Conduct, Business Conduct Standards, and CONFIDENTIAL INFORMATION.  This Agreement continues in force and effect if the Employee's duties, title, or location of work for MEDTRONIC change after this Agreement becomes effective, and any such change shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.  The obligations of Employee pursuant to this Section 2.3 shall not in any way be limited or restricted by any other provision in this Agreement.

**2.4   Protection of Former Employer.**   Employee agrees not to divulge to, or use for the benefit of, MEDTRONIC any proprietary, trade secret, or confidential information of a former employer.

**SECTION 3:  TRAINING, CONFIDENTIAL INFORMATION AND GOODWILL**

**3.1   MEDTRONIC's Promises To Employee.**  MEDTRONIC agrees that: (a) upon commencement of employment it will provide Employee with one or more of the following:  appropriate valuable training which may include but not be limited to self-study materials and course work, classroom training, on-the-job training, and other forms of training, MEDTRONIC's valuable business and customer relationships, MEDTRONIC's goodwill, and CONFIDENTIAL INFORMATION; and (b) from time to time throughout the course of Employee's employment, MEDTRONIC will continue to provide training, access to valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION to Employee.

**3.2   Goodwill.**     Employee acknowledges that MEDTRONIC owns the goodwill in Employee's relationships with MEDTRONIC CUSTOMERS that Employee maintains or develops in the course and scope of Employee's employment by MEDTRONIC.  If Employee owned goodwill in customer relationships when Employee commenced employment with MEDTRONIC, Employee irrevocably assigns any and all such goodwill to MEDTRONIC, and MEDTRONIC shall become the sole owner of such goodwill.

**3.3   Employee's Use of Training, Business and Customer Relationships, Goodwill and CONFIDENTIAL INFORMATION.**  MEDTRONIC agrees to provide Employee with valuable training and to entrust Employee with such of MEDTRONIC's valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION as is necessary for Employee to discharge Employee's duties. Employee agrees to use such valuable training and to continue to develop such relationships, goodwill and CONFIDENTIAL INFORMATION solely and exclusively for MEDTRONIC's benefit.

**3.4   Fiduciary Duties.**  Employee agrees that Employee shall treat all CONFIDENTIAL INFORMATION, training, business and customer relationships, and goodwill entrusted to Employee by MEDTRONIC

3

PLTFS NOL – 000052

as a fiduciary, and Employee accepts and undertakes all of the obligations of a fiduciary, including loyalty, good faith, trust, confidence and candor, and Employee agrees to use such training and to maintain, protect and develop CONFIDENTIAL INFORMATION, business and customer relationships, and goodwill solely and exclusively for the benefit of MEDTRONIC. The obligations of Employee pursuant to this Section 3.4 shall not in any way be limited or restricted by any other provision in this Agreement.

**3.5** **MEDTRONIC Property.** All documents and things provided to Employee by MEDTRONIC for use in connection with Employee's employment, or created by the Employee in the course and scope of Employee's employment by MEDTRONIC, are the property of MEDTRONIC and shall be held by Employee as a fiduciary on behalf of MEDTRONIC. Upon termination of Employee's employment, Employee shall return promptly to MEDTRONIC, without the requirement of a prior demand by MEDTRONIC, all such documents and things, together with all copies, recordings, abstracts, notes, reproductions or electronic versions of any kind made from or about the documents and things or the information they contain.

**3.6** **Nondisclosure of CONFIDENTIAL INFORMATION.** Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after employment, for as long as the information retains the characteristics described in Section 1.3. Employee further agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services. This provision is intended to govern any disclosure outside of MEDTRONIC. Please refer to Medtronic's Global Security Policy for applicable restrictions on sharing CONFIDENTIAL INFORMATION with other MEDTRONIC Employees during your employment with MEDTRONIC. The obligations of Employee pursuant to this Section 3.6 shall not in any way be limited or restricted by any other provision in this Agreement. Nothing in this Agreement prohibits Employee from reporting an event that Employee reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an investigation conducted by such a government agency. This may include disclosure of trade secret or confidential information within the limitations permitted by the 2016 Defend Trade Secrets Act (DTSA). Employee is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (A) is made **in confidence to** a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made **solely for the purpose of** reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, **if such filing is made under seal** so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document contain the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

**3.7** **Nondisclosure of Legally Protected Information.** Employee acknowledges and agrees that various federal, state and local statutes, laws, rules, and regulations regulate, prohibit, or restrict access to and the use and dissemination of data and information about patients, customers, health care providers, or others ("Legally Protected Information"). Such Legally Protected Information may include, by way of example but not by way of limitation, patient data, employee data, credit card data, medical records, social security numbers, Medicare or Medicaid data, drivers' license numbers, information protected by HIPAA, and similar types of information. Employee agrees not to use or

disseminate any Legally Protected Information for any purpose not permitted by the applicable federal, state and local statutes, laws, rules, and regulations.

## SECTION 4: POST-EMPLOYMENT RESTRICTIONS

**4.1  Restrictions on Competition.**   Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.  If, however, during the last twelve (12) months of employment with MEDTRONIC, Employee had no management duties or responsibilities and was engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, this restriction will be for a duration of only one (1) year after the last day Employee is employed by MEDTRONIC, and will prohibit Employee only from soliciting, selling to, contacting, or attempting to divert business from, whether directly or by managing, directing or supervising others, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

**4.2  Prohibition on Solicitation of MEDTRONIC Employees.**   Employee agrees that at all times while employed by MEDTRONIC, and for one (1) year thereafter, Employee will not directly or indirectly solicit, cause to be solicited, or participate in or promote the solicitation of any person to terminate that person's employment with MEDTRONIC or to breach that person's employment agreement with MEDTRONIC, or to perform services for or become employed by a CONFLICTING ORGANIZATION.

**4.3  Post-Employment Disclosure.**   In the event Employee's employment with MEDTRONIC terminates, Employee agrees that during the term of the restrictions described in Section 4.1, Employee will immediately inform MEDTRONIC if Employee has accepted an offer of employment from any new employer, and shall immediately disclose to MEDTRONIC in writing the identity of any new employer, the job title of Employee's new position, and a description of any services to be rendered to that employer.  In addition, Employee agrees to respond within ten (10) days to any written request from MEDTRONIC for further information concerning Employee's work activities sufficient to provide MEDTRONIC with assurances that Employee is not violating any of the obligations Employee has undertaken in this Agreement.

## SECTION 5: COMPENSATION FOR NON-COMPETITION PERIOD

**5.1  Post-Termination Compensation.**   If Employee is unable to accept a bona fide offer of employment from a new employer solely on account of Section 4.1 and subsequently experiences Economic Hardship as a result thereof, MEDTRONIC will make a Payment to the Employee as provided herein.

**5.2  Definitions.**   In this Section 5, "Payment" means an amount equal to the Employee's Monthly Base Pay minus any Other Compensation the Employee receives or is entitled to receive for each month during which benefits are sought (less applicable state and federal taxes).  "Monthly Base Pay" shall be calculated by determining Employee's total salary and commissions (excluding benefits, bonuses, and any indirect or deferred compensation) for the last four (4) full MEDTRONIC fiscal quarters preceding termination of Employee's employment and dividing that amount by twelve (12).  "Other Compensation" means unemployment compensation, severance benefits, and earned income whether received from MEDTRONIC or from any source other than MEDTRONIC.  "General Counsel" means the General Counsel of MEDTRONIC or the designee of the General Counsel.  "Economic Hardship" results when Other Compensation is less than seventy-five percent (75%) of Employee's Monthly Base Pay.

0616

5

**5.3**  **Term.**   MEDTRONIC's obligation to make the Payments shall terminate upon expiration of the period specified in Section 4.1 or upon MEDTRONIC's written waiver at any time of Employee's obligations under Section 4.1, whichever comes first.

**5.4**  **Requirement of Bona Fide Offer.**  MEDTRONIC shall be obliged to make an initial Payment provided in Section 5.1 only if (1) Employee provides the General Counsel of MEDTRONIC written confirmation of a bona fide offer of employment within ten (10) days after receipt of the offer by the Employee, and (2) the General Counsel determines that Employee is unable to accept the offer solely because of Section 4.1. Upon making such a determination, the General Counsel shall notify the Employee that the Employee is entitled to an initial Payment, provide the Employee with the address to which Employee shall provide the Reports required by Section 5.5, and direct the appropriate MEDTRONIC personnel to make an initial Payment.

**5.5**  **Reporting Requirement.**   After the General Counsel determines that Employee is entitled to receive an initial Payment, MEDTRONIC will be obliged to make any subsequent Payments only if Employee delivers to the address specified by the General Counsel the following Report by the tenth (10th) day of each month in which the Employee seeks to receive subsequent Payments:

(a) A statement describing the details of Employee's good faith efforts during the preceding calendar month to find employment consistent with Employee's education, abilities and experience which would not involve violation of Section 4.1 and describing the reasons, if any, that Employee was unable to find such a position.

(b) A statement by the Employee that the Employee has not violated any provision described in Section 8.3 of this Agreement.

(c) A statement of the name, address and telephone number of any person or entity from which the Employee received earned income during the preceding calendar month.

(d) Written evidence (*e.g.*, check stubs, direct deposit notices) of all Other Compensation received by Employee during the preceding calendar month.

If all required information listed above is timely provided and if MEDTRONIC determines that (1) Employee has made adequate good faith efforts under subparagraph (a) above and (2) the Restrictions on Competition in Section 4.1 have resulted in Economic Hardship to Employee, MEDTRONIC will make a Payment to the Employee.

**5.6**  **Right to Waive.**   MEDTRONIC shall have no obligation to make any Payments provided in Section 5.1 if (1) within ten (10) days after MEDTRONIC is provided a copy of the bona fide written offer of employment by Employee, MEDTRONIC, in its sole and unreviewable discretion, provides a complete or conditional waiver of its right to enforce Section 4.1 as to the specific position described in the bona fide offer of employment or (2) within ten (10) days of making a Payment under Section 5.4 or Section 5.5, MEDTRONIC, in its sole and unreviewable discretion, waives its right to enforce Section 4.1 for the remaining period of the restriction.  Such waivers shall be in writing signed by the General Counsel or appointed designee.

## SECTION 6: INVENTIONS

**6.1**  **Disclosure.**  Employee agrees to promptly disclose to MEDTRONIC in writing all INVENTIONS.

**6.2**  **Ownership, Assignment and Recordkeeping.** All INVENTIONS shall be the exclusive property of MEDTRONIC.   Employee hereby assigns all INVENTIONS to MEDTRONIC and authorizes MEDTRONIC to file patent applications on Employee's behalf.  Employee agrees to keep accurate,

PLTFS NOL – 000055

complete and timely records of Employee's INVENTIONS, which records shall be the property of MEDTRONIC and shall be retained on MEDTRONIC's premises.

**6.3** **Cooperation.** During and after the termination of Employee's employment, Employee agrees to give MEDTRONIC all cooperation and assistance necessary to perfect, protect, and use its rights to INVENTIONS. Without limiting the generality of the foregoing, Employee agrees to sign all documents, do all things, and supply all information that MEDTRONIC may deem necessary to (a) transfer or record the transfer of Employee's entire right, title and interest in INVENTIONS, and (b) enable MEDTRONIC to obtain patent, copyright or trademark protection for INVENTIONS anywhere in the world.

**6.4** **Attorney-in-Fact.** Employee irrevocably designates and appoints MEDTRONIC and its duly authorized officers and agents as attorney-in-fact to act for and in Employee's behalf and stead to execute and file any lawful and necessary documents, and to do all other lawfully permitted acts, required for the assignment of, application for, or prosecution of any United States or foreign application for letters patent, copyright or trademark with the same legal force and effect as if executed by Employee.

**6.5** **Waiver.** Employee hereby waives and quitclaims to MEDTRONIC any and all claims, of any nature whatsoever, which Employee may now have or may hereafter have for infringement of any patent, copyright, or trademark resulting from any INVENTION.

**6.6** **Future Patents.** Any INVENTION relating to the business of MEDTRONIC with respect to which Employee files a patent application within one (1) year following termination of Employee's employment shall be presumed to cover INVENTIONS conceived by Employee during the term of Employee's employment, subject to proof to the contrary by Employee by good faith, contemporaneous, written and duly corroborated records establishing that such INVENTION was conceived and made following termination of employment and without using CONFIDENTIAL INFORMATION.

**6.7** **Release or License.** If an INVENTION does not relate to the existing or reasonably foreseeable business interests of MEDTRONIC, MEDTRONIC may, in its sole and unreviewable discretion, release or license the INVENTION to the Employee upon written request by the Employee. No release or license shall be valid unless in writing signed by MEDTRONIC's Chief Patent Counsel or MEDTRONIC's General Counsel.

**6.8** **Notice.** Pursuant to Minnesota Statutes Section 181.78, Employee is hereby notified that this Agreement does not apply to any INVENTION for which no equipment, supplies, facility or trade secret information of MEDTRONIC was used and which was developed entirely on the Employee's own time, and (1) which does not relate (a) directly to the business of MEDTRONIC or (b) to MEDTRONIC's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the Employee for MEDTRONIC.

## SECTION 7: GOVERNING LAW, VENUE AND JURISDICTION

**7.1** **Place of Agreement.** Because the operational headquarters of MEDTRONIC is located in Minnesota and because it is mutually agreed that it is in the best interests of MEDTRONIC and all of its employees that a uniform body of law consistently interpreted be applied to the employment agreements between MEDTRONIC and all of its employees, this Agreement is deemed entered into in the State of Minnesota between MEDTRONIC and Employee, and the substantive laws of Minnesota, without regard to conflict of laws rules, and the exclusive jurisdiction of the courts of Minnesota, shall be applicable hereto on the terms and conditions specified below.

**7.2** **Governing Law.** The validity, enforceability, construction and interpretation of this Agreement shall be governed by the laws of the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have the laws of any state or nation or other legal jurisdiction other than the State of Minnesota apply to this Agreement.

**7.3** **Venue and Personal Jurisdiction.** Any dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota. Employee irrevocably waives Employee's right, if any, to have any disputes between Employee and MEDTRONIC arising out of or related to this Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota. Employee hereby irrevocably consents to the personal jurisdiction of the state courts in the State of Minnesota for the purposes of any action arising out of or related to this Agreement.

**7.4** **Covenant Not to Sue.** Employee irrevocably covenants not to sue MEDTRONIC in any jurisdiction other than a state court in the State of Minnesota for the purposes of any action arising out of or related to this Agreement. Employee further agrees not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state court in the State of Minnesota; provided, however, that nothing herein shall prohibit or restrict Employee from being a witness or otherwise providing evidence in any action pursuant to court order or subpoena.

## SECTION 8:  OTHER PROVISIONS

**8.1** **Obligations Unconditional.** The obligation of the parties to perform the terms of this Agreement is unconditional and does not depend on the performance or nonperformance of any terms, duties, or obligations not specifically recited in this Agreement. Employee irrevocably waives Employee's right to challenge the enforceability or validity of any portion of this Agreement. It shall not be a defense to any claim brought against Employee by MEDTRONIC that MEDTRONIC has not pursued legal action against any other person or entity, even if that person or entity is identically or similarly situated to Employee.

**8.2** **Waiver.** No waiver by MEDTRONIC of any breach of this Agreement by Employee shall be valid unless contained in a writing signed by the General Counsel of MEDTRONIC or the General Counsel's designee. Waiver of any breach of this Agreement shall not constitute, or be deemed, a waiver of any other breach of this Agreement.

**8.3** **Provisions Survive Termination.** To the extent that any provisions of this Agreement apply to the time period after, or require performance or enforcement after, termination of Employee's employment, all such provisions survive the termination of Employee's employment and termination of this Agreement and may be enforced subsequent thereto. Without limiting the generality of the foregoing, Section 1, Sections 3.2, 3.3, 3.4, 3.5 and 3.6, Section 4, Section 5, Section 6 and Section 7 each survive termination of Employee's employment and termination of this Agreement.

**8.4** **Prior Agreements.** Except to the extent provided in Section 8.6, all prior agreements, if any, between MEDTRONIC and Employee relating to any part of the subject matter of this Agreement are superseded and rendered null and void upon execution of this Agreement by Employee; provided, however, that nothing in this Agreement invalidates, renders null or void, or otherwise affects any term or provision of any MEDTRONIC compensation or benefit plan or any agreements related thereto, or any written term employment agreement.

**8.5** **Application to Employees Who Are Attorneys.**  This agreement will not be interpreted or enforced so as to conflict with any applicable attorney Rules of Professional Conduct relating to the right of a lawyer to practice law.

**8.6** **Validity Not Impaired.**  In the event that any provision of this Agreement is unenforceable under applicable law, the validity or enforceability of the remaining provisions shall not be affected.  To the extent any provision of this Agreement is judicially determined to be unenforceable, any provisions of any prior agreement between Employee and MEDTRONIC addressing the subject matter of the unenforceable provision shall be deemed to govern the relationship between Employee and MEDTRONIC.

**8.7** **Transfer or Assignment.**  MEDTRONIC may transfer or assign its rights and obligations pursuant to this Agreement to its successors or assigns.

**8.8** **Tolling.**  In the event Employee breaches or violates Sections 4.1, 4.2 or 4.3 hereinabove, the duration of the restrictions contained therein shall be extended by the number of days the Employee remains in breach or violation thereof.  This provision may be specifically enforced.

This Agreement becomes binding and effective on MEDTRONIC and Employee upon signature by Employee.

_____          _Charles Boykin_          _3/4/2020_
Employee Signature                    Employee Name (please print)          Date



**Medtronic**

Medtronic, Inc.
6200 Coral Sea Street NE
Mounds View, MN 55112

March 4, 2020

To: Chuck Boykin
From: Jim Keblinger

**RE:** **Retention Incentive Agreement:** Chuck Boykin, 225623, Location: San Antonio, TX

As part of our ongoing Medtronic Diabetes operations and customer service, we have identified you as holding a position and expertise that continue to be critical to the success of our team. Accordingly, we would like to offer to you certain benefits should you remain employed by Medtronic for certain periods of time and meet certain performance expectations.

In order to be eligible for the benefits under this Agreement as well as future Medtronic benefits, you must sign this Agreement as well as the current Medtronic Employee Agreement. A copy of the Medtronic Employee Agreement is attached for your review. Both this Agreement and the Medtronic Employee Agreement must be signed and returned by March 6, 2020 to rs.hrbusinessoperations@medtronic.com to ensure your eligibility for the benefits under this Agreement as well as future Medtronic benefits.

The terms of this Agreement are as follows:

1. **Retention Incentive.** If you sign this Agreement by March 6, 2020 you will receive the payment referenced below and in Paragraph 3 ("Retention Incentive"), subject to the terms and conditions of this Agreement. In order to retain this Retention Incentive you must remain continuously and actively employed with Medtronic in your current position (or another role assigned to you by Medtronic leadership) through the specified dates outlined below. If you do not remain continuously and actively employed with Medtronic as required then you will be required to and you agree to repay the entire Retention Incentive to Medtronic:

    Provided you sign this Agreement and the Medtronic Employee Agreement, you will receive a cash payment of $15,000 USD (less applicable withholdings and deductions) on your next payroll check. To retain this payment you must remain continuously and actively employed with Medtronic in your current position (or another role assigned to you by Medtronic leadership) until March 20, 2021 and meet all other conditions of this Agreement. If you do not, you will be required to and you agree to repay the entire Retention Incentive to Medtronic.

2. **Treatment of Retention Incentive on Termination of Employment.**

1/3

(a) **Termination without Cause, Death, or Disability.** If you are terminated without Cause or upon your death or disability (as the term "disability" is defined in Medtronic's long-term disability plan), you or your estate will be entitled to retain the full balance of the Retention Incentive specified in Paragraph 1.

**For "Cause" Definition.** For Purposes of this Agreement, termination for "Cause" shall constitute termination for the following: (i) your continued failure to substantially perform your duties and responsibilities satisfactorily for Medtronic (as determined in Medtronic's sole discretion), provided however, that prior to termination of your employment for such unsatisfactory performance, Medtronic will provide you with written notice of your deficiencies and you will then have 30 calendar days to cure any such deficiencies; or (ii) your engagement in conduct that results in a felony or gross misdemeanor conviction; or (iii) your engagement in illegal conduct, an act of dishonesty, theft or other conduct, act or omission that, in the sole and absolute discretion of Medtronic, could materially damage the reputation of Medtronic, Medtronic products or Medtronic Confidential Information; or (iv) your material breach of any provision of this Agreement; or (v) your violation of any Medtronic corporate or business policy as provided by the standards of the applicable policy, including but not limited to, Medtronic's Code of Conduct, Medtronic's Sexual Harassment and Offensive Conduct Policy, violation of Medtronic's Business Conduct Standards; or (vi) your material breach of your fiduciary duties to Medtronic, or any falsification of records maintained by Medtronic submitted to any regulatory body, governmental agency, or insurer.

(b) **Termination for Cause.** If you are terminated for "Cause," you shall immediately be required to and you agree to repay the entire Retention Agreement to Medtronic.

(c) **Voluntary termination.** You shall not be entitled to retain any payment under this Agreement if you voluntarily terminate your employment before the date specified in Paragraph 1. However, you may retain full payment of the Retention Incentive if you terminate your employment because you are required to move more than 50 miles from your current work location.

(d) **Involuntary termination not for cause.** If you have been involuntarily terminated as part of a reduction in force or due to job elimination, you will be entitled to retain full payment of the Retention Incentive specified in Paragraph 1.

3. **Payment.** Any payment of the Retention Incentive specified in Paragraph 1, to the extent earned, will be paid to you in a single, lump sum payment (less applicable withholdings and deductions) on your next payroll period after you sign this Agreement and the Medtronic Employee Agreement.

4. **Other Important Provisions.** During the retention period, you may be requested to assume different duties and responsibilities. Nothing contained in this Agreement is intended to create an express or implied contract of employment for any particular duration, or to change your at-will employment relationship with Medtronic.

PLTFS NOL – 000060

As detailed above, your eligibility to retain the Retention Incentive outlined in this Agreement as well as future Medtronic benefits is contingent upon your execution of the most current version of Medtronic's Employment Agreement, a copy of which is enclosed with this letter.

This letter contains the entire terms and conditions of the Retention Incentive and supersedes all prior communication or understandings relating to the subject of the Retention Incentive. Any modification or amendment of this Agreement will be made in writing in a format that is either a personalized letter or memorandum that is directed to you by Medtronic.

We appreciate your continued service to Medtronic.

Agreed to and acknowledged
this ___3___ day of ___2020___ .

By: _____
                NAME

Very truly yours,

Jim Keblinger
V.P. Installed Base & Inside Operations, Americas

Enclosure
(Medtronic Employee Agreement)

3/3



**Medtronic, Inc.**
18302 Talavera Ridge
San Antonio, TX 78257
www.medtronicdiabetes.com
tel  800.646.4633

*Sent via personal email to chuckboykin@gmail.com*

February 17, 2021

Mr. Chuck Boykin
938 Olivia View
San Antonio, TX 78260

Dear Mr. Boykin:

The purpose of this letter is to follow up on communications that have taken place regarding the usage of your American Express corporate card in violation of Medtronic's Expense Reporting and Corporate Card policies. Because I was unable to reach you via phone to discuss in detail, please find the details below with the total exposure related to these violations of $70,609.16. Please feel free to call me to discuss this information.

Following is a summary of the amounts Medtronic has identified as personal expenses that you are being asked to repay:

| Category | Amount | Details |
|---|---|---|
| Gift Cards – discrepancies between itemized receipts and expense reports | $64,050 | Attachment #1 |
| Gift Cards – Discrepancies between 2020 incentive tracker and expense reports | $3,750 | Attachment #2 |
| Personal Lodging Expense – Days Inn in Destin, FL | $1,147.67 | |
| Personal Lodging Expense – Tuscaloosa, AL | $176.56 | |
| Personal Car Rental Expense rented from SA, TX Airport | $702.37 | |
| First-class upgrades disguised as baggage | $258 | |
| Meals at Denver Airport and MSP Airport with merchant details missing | $116.86 | |
| Team-Building Event at Marina – No record that employees participated | $407.70 | |
| Total | $70,609.16 | |

EXHIBIT C



If we do not hear from you to discuss a payment plan option, or receive payment by March 12, 2021, Medtronic may take additional action to recoup funds.


Sincerely,


Rebecca Garza, SPHR
Rebecca.Garza@medtronic.com
Senior Employee Relations Partner
Medtronic Diabetes

cc:  Michael Cox

| Comments | Calculated Exposure | TRAVNAME | BCCNAME | EXTERNAL_REPORT_ID | SUBMITTED_DATE | TRANSACTION_DATE | BASEAMOUNT | PAIDBYNAME | CATEGORY NAME | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| Two $300 gcs, not 6 $100 gcs | $600 | Boykin, Chuck | Medtronic US Diabetes | JTDBCWML | 1/30/2020 | 12/9/2019 | $611.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | HOLIDAY CELEBRATION RAFFLE CARDS VALUE $100 EACH REP |
| 1 $300 gc, not 3 $100 gcs | $300 | Boykin, Chuck | Medtronic US Diabetes | WWZPJXOV | 4/29/2019 | 3/16/2019 | $305.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES WINNER 100 EA. |
| 1 $400 gc, not 4 $100 | $400 | Boykin, Chuck | Medtronic US Diabetes | WWZPJXOV | 4/29/2019 | 3/3/2019 | $405.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES DRAWING WINNERS 100 EA. |
| 1 $300 gc, not 3 $100 gcs | $300 | Boykin, Chuck | Medtronic US Diabetes | WWZPJXOV | 4/29/2019 | 2/21/2019 | $305.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES 3 DRAWING WINNERS 100EA. |
| 2 $300 gcs, not 6 $100 gcs | $600 | Boykin, Chuck | Medtronic US Diabetes | ZMGVKUOJ | 2/12/2019 | 1/24/2019 | $611.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | SUPERBOWL DRAWING WINNERS,2 3PACKS OF GIFT CARDS, 6 WINNERS OF $100 EA. |

| Description | Category | Account | Amount | Date | Date | Code | Vendor | Name | Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| HOLIDAY INCENTIVES FOR EMPLOYEES WORKING HOLIDAY. LEADS DRAWING, 100 EA | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/24/2018 | 1/14/2019 | CGBHFOIZ | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500 gc, not 5 $100 gcs |
| HOLIDAY INCENTIVES SUPERVISORS. 100 EA WHO WORKED HOLIDAY | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/17/2018 | 1/14/2019 | CGBHFOIZ | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500 gc, not 5 $100 gcs |
| OT INCENTIVES FOR WORKING RELEASE OF BACKORDERS. $100 EACH PERSON | | | $305.95 | 11/10/2018 | 12/17/2018 | KDJZGGOH | Medtronic US Diabetes | Boykin, Chuck | $ 300 | 1 $300 gc, not 3 $100 gcs |
| HOLIDAY INCENTIVES HL, 100 EA. DRAWING WINNER | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/7/2018 | 1/14/2019 | CGBHFOIZ | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500 gc, not 5 $100 gcs |
| ATTENDANCE INCENTIVE | Misc: Empl Gift/Recognition | AMEX Corporate Card | $305.95 | 10/27/2018 | 1/14/2019 | CGBHFOIZ | Medtronic US Diabetes | Boykin, Chuck | $ 300 | 1 $300 gc, not 3 $100 gcs |

PLTFS NOL – 000065

| Description | Category | Card | Amount | Date 1 | Date 2 | Code | Vendor | Name | Value | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| S, 100 EACH DRAWING WINNER / ATTENDANCE DRAWING WINNERS, 100 EACH. | Misc: Empl Gift/Recognition | AMEX Corporate Card | $305.95 | 10/27/2018 | 1/14/2019 | CGBHFOIZ | Medtronic US Diabetes | Boykin, Chuck | $300 | 1 $300 gc, not 3 $100 gcs |
| HL OT INCENTIVES 5 DRAWING WINNERS $100 EACH. | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 10/25/2018 | 12/17/2018 | KDJZGGOH | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $500 gc, not 5 $100 gcs |
| OT INCENTIVES FOR HL. $100 TRAINING WINNERS. | Misc: Empl Gift/Recognition | AMEX Corporate Card | $305.95 | 10/25/2018 | 12/17/2018 | KDJZGGOH | Medtronic US Diabetes | Boykin, Chuck | $300 | 1 $300 gc, not 3 $100 gcs |
| GIFT CARD WINNERS OT INCENTIVE $100 EACH WINNER | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 10/13/2018 | 11/8/2018 | EHHIECQF | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $500 gc, not 5 $100 gcs |
| CSW DRAWING WINNERS 5 $100 GIFT CARD WINNERS | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 10/13/2018 | 11/8/2018 | EHHIECQF | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $500 gc, not 5 $100 gcs |
| $100 OT DRAWING WORKERS | Misc: Empl Gift/Recognition | AMEX Corporate Card | $504.95 | 9/6/2018 | 10/12/2018 | ROTZRFZX | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $500, not 5 $100 |

| Description | Category | Card | Amount | Date | Date | Code | Vendor | Name | Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| FOR SEPT OT DRIVE 6 $100 OT DRAWING WINNERS | Misc: Empl Gift/Recognition | AMEX Corporate Card | $611.90 | 6/22/2018 | 7/30/2018 | XQRQKDFZ | Medtronic US Diabetes | Boykin, Chuck | $600 | 2 $300 gcs, not 6 $100 gcs |
| OT INCENTIVES FOR STAFFING GAPS 6 $100 WINNERS | Misc: Empl Gift/Recognition | AMEX Corporate Card | $605.95 | 5/22/2018 | 7/23/2018 | OPJRNMAE | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $100, 1 $500, not 6 $100 |
| HELPLINE OT INCENTIVES DRAWING WINNERS. $50 EACH WINNER (10 WINNERS) | | | $511.90 | 5/22/2018 | 7/23/2018 | OPJRNMAE | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $300, 1 $200, not 10 $50 |
| OT INCENTIVES $50 $10 WINNERS. | Misc: Empl Gift/Recognition | AMEX Corporate Card | $504.95 | 5/17/2018 | 7/23/2018 | OPJRNMAE | Medtronic US Diabetes | Boykin, Chuck | $500 | 1 $500, not 50 $10 |
| OT INCENTIVES AWARDS. $50 GIFT CARDS EACH | Misc: Empl Gift/Recognition | AMEX Corporate Card | $417.17 | 5/5/2018 | 7/23/2018 | OPJRNMAE | Medtronic US Diabetes | Boykin, Chuck | $400 | 2 $200, not 8 $50 |
| 16 @ $50, APRIL/MAY OT INCENTIVES FOR | Misc: Empl Gift/Recognition | AMEX Corporate Card | $811.90 | 5/2/2018 | 7/30/2018 | XQRQKDFZ | Medtronic US Diabetes | Boykin, Chuck | $800 | 2 $400 gcs, not 16 $50 gcs |

| | | | | | | | | | Misc: Empl Gift/Recognition | STAFFING SHORTAGES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 $250, not 5 $50 | $250 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/31/2018 | $200.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 4 $50 GIFT CARD |
| 1 $200, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/30/2018 | $205.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | CVS/PHARMACY #03551 SAN ANTONIO TX |
| 1 $200, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/30/2018 | $205.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | CVS/PHARMACY #03551 SAN ANTONIO TX |
| 1 $400, not 8 $50 | $400 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/18/2018 | $413.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES $50 EACH NAME |
| 1 $400, not 8 $50 | $400 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/10/2018 | $405.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES 8 WINNERS $50 EACH NAME |
| 2 $100, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/10/2018 | $211.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | HEB #658 000000000 19 SAN ANTONIO TX |
| 1 $400, not 8 $50 | $400 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/8/2018 | $404.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 8 OT INCENTIVES $50 EACH NAME |

| Description | Amount | Name | Company | Code | Date | Date | Amount | Card | Category | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 $500, not 10 $50 | $500 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/8/2018 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 10 OT INCENTIVE WINNERS $50 EACH NAME |
| 1 $200, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 3/2/2018 | $256.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | HEB GIFT CARDS 5 X $50 FOR OT SIGN UP RAFFLE |
| 1 $200, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | ZGJOYMRZ | 3/23/2018 | 3/2/2018 | $256.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | EMPLOYEE APPRECIATION DRAWINGS HEB CARDS 5 X $50 |
| 2 $200, not 8 $50 | $400 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 2/20/2018 | $413.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVE S $50 EACH NAME |
| 1 $500 an 1 $400 card, not 30 cards | $900 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 2/5/2018 | $909.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 30 HEB CARDS FOR 30 REPS ASSIGNED |
| 1 $500 gc, not 10 $50 | $500 | Boykin, Chuck | Medtronic US Diabetes | VRSPXPMY | 4/26/2018 | 2/4/2018 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 10X $50 HEB CARDS FOR PERFECT ATTENDANCE |
| 3 $200 gcs, not 12 $50 gcs | $600 | Boykin, Chuck | Medtronic US Diabetes | ZGJOYMRZ | 3/23/2018 | 2/3/2018 | $605.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT RAFFLE WINNERS 12X$50 CARDS |
| 1 $300, not 3 $100 | $300 | Boykin, Chuck | Medtronic US Diabetes | NCNHWUTG | 3/12/2018 | 1/19/2018 | $304.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | JAN OT DRAWINGS 3$100 |

| Description | Amount | Name | Vendor | Code | Date | Date | Amount | Card | Category | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 $200 gcs, not 4 $100 gcs | $ 400 | Boykin, Chuck | Medtronic US Diabetes | CPVNWOKM | 3/28/2018 | 1/19/2018 | $413.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | GHL OT DRIVE RAFFLE WINNERS 4X$100 |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | CPVNWOKM | 3/28/2018 | 1/11/2018 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | SOLUTIONS TEAM OT DRIVE RAFFLE WINNERS. $100 X 5 |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | MSWAVYTS | 2/26/2018 | 1/11/2018 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES 5 $100 CARDS |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | MSWAVYTS | 2/26/2018 | 1/11/2018 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVE DRAWINGS 5 $100 WINNERS |
| 1 $300, 1 $200, 2 $100, not 7 $100 | $ 700 | Boykin, Chuck | Medtronic US Diabetes | RIUGOJXQ | 2/13/2018 | 12/30/2017 | $712.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 7 $100 OT INCENTIVE DRAWING WINNERS |
| 1 $300, 1 $200, 1 $50, not 5 $50 and 3 $100 | $ 550 | Boykin, Chuck | Medtronic US Diabetes | RIUGOJXQ | 2/13/2018 | 12/23/2017 | $555.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 1 $50, 4 $50, 3 $100. OT DRAWINGS |
| 1 $50, not 2 $25 | $ 50 | Boykin, Chuck | Medtronic US Diabetes | RIUGOJXQ | 2/13/2018 | 12/23/2017 | $50.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 2 $25 STARBUCKS GIFT CARDS |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | RIUGOJXQ | 2/13/2018 | 12/22/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 5 #100 WINNERS OT |

| INCENTIVES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| HOLIDAY DRAWINGS: $45 CARD, $15 CARD, $30 CARD, 4 $100, 4 $100 | Misc: Empl Gift/Recognition | AMEX Corporate Card | $902.00 | 12/10/2017 | 2/6/2018 | JIXRZKOM | Medtronic US Diabetes | Boykin, Chuck | $ 800 | 2 $400, not 8 $100 |
| SUBMITTED LATE DUE TO LOST RECIEPT. HOLIDAY RAFFLE WINNERS $600 X5. | Misc: Empl Gift/Recognition | AMEX Corporate Card | $605.95 | 12/7/2017 | 3/12/2018 | NCNHWUTG | Medtronic US Diabetes | Boykin, Chuck | $ 600 | 1 $500, 1 $100, not 6 $100 |
| NR OT INCENTIVES | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 12/3/2017 | 12/28/2017 | RSCBVXYP | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |
| 5 PACK $100 CARDS, WEELY OT DRAWINGS. $100 EACH WINNER | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/24/2017 | 1/10/2018 | TMMCZTDB | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |
| NEW HIRE OT INCENTIVES | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/9/2017 | 12/25/2017 | KFIHTOJK | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |
| 5 PACK $100 GIFT | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 11/9/2017 | 1/8/2018 | YTYWHINR | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |

PLTFS NOL – 000071

| Note | Amount | Name | Vendor | Code | Date | Date | AMEX Amount | Card | Misc | CARDS, OT SIGN UPS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | KFIHTOJK | 12/25/2017 | 11/5/2017 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES |
| 2 $300, not 6 $100 | $ 600 | Boykin, Chuck | Medtronic US Diabetes | TLBWOLHX | 1/8/2018 | 11/4/2017 | $611.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT DRAWINGS FOR NR/SA, 2 PACKS OF $100 CARDS. 6 WINNERS $100 EA |
| Appears that gc was emailed to subject | $ 200 | Boykin, Chuck | Medtronic US Diabetes | CHKXKOAB | 12/26/2017 | 10/27/2017 | $200.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES GIFT CARD |
| 2 $200, not 4 $100 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | CHKXKOAB | 12/26/2017 | 10/20/2017 | $412.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | NEW HIRE OT WEEKLY INCENTIVES |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | CHKXKOAB | 12/26/2017 | 10/20/2017 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | WEEKLY OT INCENTIVES |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | CHKXKOAB | 12/26/2017 | 10/20/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES |
| 2 $200, not 4 $100 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | KREUZCPN | 11/6/2017 | 10/12/2017 | $412.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES $100 EA |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | KREUZCPN | 11/6/2017 | 10/12/2017 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | TEAM INCENIVES WINNERS 100EA |

| Incentive Detail | Amount | Employee | Vendor | Code | Date | Date | Charge Amount | Payment | Category | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 $500, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | XQOHMRIM | 11/7/2017 |  | $1,011.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES $100 EA |
| 1 $500, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | XQOHMRIM | 11/7/2017 | 10/2/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | GIFT CARDS CUSTOMER SERVICE WEEK/OTC TX |
| 2 $400, not 8 $100 | $800 | Boykin, Chuck | Medtronic US Diabetes | ASYFLRLJ | 10/20/2017 | 9/30/2017 | $809.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | CVS/PHARMACY #03551 SAN ANTONIO TX |
| 3 $300, not 9 $100 | $900 | Boykin, Chuck | Medtronic US Diabetes | ASYFLRLJ | 10/20/2017 | 9/24/2017 | $914.85 | AMEX Corporate Card | Misc: Empl Gift/Recognition | MVB INCENTIVES 100 EA |
| 1 $500, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | MOUDRGIH | 10/30/2017 | 9/16/2017 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT RAFFLE WINERS, $100 EA |
| 1 $300, 1 $200, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | MOUDRGIH | 10/30/2017 | 9/15/2017 | $511.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | HEB #658 00000000019 SAN ANTONIO TX |
| 1 $500, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | MOUDRGIH | 10/30/2017 | 9/1/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT RECALL INCENTIVES, $100 EA |
| 1 $200, 1 $300, 1 $400, not 9 $100 | $900 | Boykin, Chuck | Medtronic US Diabetes | SGZZCOCB | 10/19/2017 | 9/1/2017 | $916.85 | AMEX Corporate Card | Misc: Empl Gift/Recognition | NR OT INCENTIVES 100 EA. |
| 3 $500, not 15 $100 | $1,500 | Boykin, Chuck | Medtronic US Diabetes | UVNOUDED | 9/13/2017 | 8/30/2017 | $1,517.85 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT RAFFLE, 15 WINNERS |

PLTFS NOL – 000073

| | | | | | | | | | | TBD. MVB RELATED |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 $100, not 4 $50 | $200 | Boykin, Chuck | Medtronic US Diabetes | UVNOUDED | 9/13/2017 | 8/27/2017 | $200.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | CVS/PHARMACY #03551 SAN ANTONIO TX |
| 1 $500, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | UVNOUDED | 9/13/2017 | 8/16/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES RAFFLE WINNERS, 100 EACH |
| 1 $300, 1 $500, not 8 $100 | $800 | Boykin, Chuck | Medtronic US Diabetes | LFWOGZU | 9/12/2017 | 8/12/2017 | $811.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INNCEN 100 EACH |
| 1 $500, not 5 $100 | $500 | Boykin, Chuck | Medtronic US Diabetes | LFWOGZU | 9/12/2017 | 8/11/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | NR OT CARDS, 100 EACH WINNER |
| 2 $500, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | MOUDRGIH | 10/30/2017 | 8/1/2017 | $1,009.88 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT WINNERS, $100 EACH. PART OF SPLIT RECIEPT |
| 2 $500, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | LFWOGZU | 9/12/2017 | 8/1/2017 | $1,000.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES $100 CARDS |
| 2 $500, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | JQSOXRSQ | 9/12/2017 | 7/30/2017 | $1,011.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | END OF QUARTER RAFFLE FOR OT $100 WINNERS |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 $300, not 9 $100 | $900 | Boykin, Chuck | Medtronic US Diabetes | FZDWDYCW | 8/8/2017 | 7/22/2017 | $923.33 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 9 OT INCENTIVES RAFFLE $100 WINNERS |
| 1 $500, not 10 $50 | $500 | Boykin, Chuck | Medtronic US Diabetes | QUWDCERB | 8/8/2017 | 7/15/2017 | $504.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES 10 WINNERS TBD |
| 2 $500, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | QUWDCERB | 8/8/2017 | 6/28/2017 | $1,011.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT 10 $100 INCENTIVES TBD |
| 2 $500, 1 $200, not 10 cards | $1,200 | Boykin, Chuck | Medtronic US Diabetes | CEVMZZKV | 7/19/2017 | 6/22/2017 | $1,217.85 | AMEX Corporate Card | Misc: Empl Gift/Recognition | TBD OT/ATTENDANCE WINNERS OF RAFFLE |
| 2 $300, not 6 $100 | $600 | Boykin, Chuck | Medtronic US Diabetes | CEVMZZKV | 7/19/2017 | 6/13/2017 | $611.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | $100 6 DRAWING WINNERS |
| 3 $200, 1 $400, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | CMADKYWZ | 8/8/2017 | 6/4/2017 | $1,024.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | DRAWING FOR OT INCENTIVES TBD |
| 1 $200, not 2 $100 | $200 | Boykin, Chuck | Medtronic US Diabetes | CMADKYWZ | 8/8/2017 | 5/24/2017 | $205.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT WINNERS TBD NR |
| 1 $250, not 5 $50 | $250 | Boykin, Chuck | Medtronic US Diabetes | CMADKYWZ | 8/8/2017 | 5/24/2017 | $250.00 | AMEX Corporate Card | | $50 DRAWING WINNERS OT INCENTIVES |
| 1 $250, not 5 $50 | $250 | Boykin, Chuck | Medtronic US Diabetes | CMADKYWZ | 8/8/2017 | 5/24/2017 | $250.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 50 EACH OT |

PLTFS NOL – 000075

| | | | | | | | | | | DRAWINGS WINNER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 $400, not 4 $100 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | CMADKYWZ | 8/8/2017 | 5/21/2017 | $406.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES |
| 2 $400 and 2 $200, not 8 cards | $ 1,200 | Boykin, Chuck | Medtronic US Diabetes | YSEWYZWK | 6/15/2017 | 5/15/2017 | $1,224.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT INCENTIVES NR, 8 WINNERS TBD |
| 1 $400, not 2 $200 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | ETTNAOPL | 6/14/2017 | 5/14/2017 | $400.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 2 $200 OT RAFFLE WINNERS |
| 1 $400, not 4 $100 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | ETTNAOPL | 6/14/2017 | 5/14/2017 | $405.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT RAFFLE TBD |
| 1 $300, not 3 $100 | $ 300 | Boykin, Chuck | Medtronic US Diabetes | ETTNAOPL | 6/14/2017 | 5/6/2017 | $300.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT DRAWING WINNERS, $100 CARD EACH. |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | ETTNAOPL | 6/14/2017 | 5/6/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | WEEKLY OT INCENTIVE DRAWING, 5 WINNERS TBD |
| 4 $200, not 8 $100 | $ 800 | Boykin, Chuck | Medtronic US Diabetes | EBTVTDMA | 5/11/2017 | 4/14/2017 | $812.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | EOM OT RAFFLE, TBD |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | EBTVTDMA | 5/11/2017 | 4/1/2017 | $505.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | NR EOM RAFFLE, TBD |
| 1 $500, not 5 $100 | $ 500 | Boykin, Chuck | Medtronic US Diabetes | EBTVTDMA | 5/11/2017 | 3/16/2017 | $503.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | ATTENDANCE RAFFLE WINNERS, TBD |

| Description | Category | Card | Amount | Date | Date | Code | Vendor | Name | Amount | Threshold |
|---|---|---|---|---|---|---|---|---|---|---|
| SA ATTENDANCE REWARDS RAFFLE/TBD | Misc: Empl Gift/Recognition | AMEX Corporate Card | $503.95 | 3/16/2017 | 5/11/2017 | EBTVTDMA | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |
| ATTENDANCE INCENTIVES FOR MARCH TBD | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 3/11/2017 | 3/30/2017 | KJKZUUMU | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 5 $100 |
| TRAINING AND OT RAFFLE TBD | Misc: Empl Gift/Recognition | AMEX Corporate Card | $607.90 | 3/10/2017 | 3/30/2017 | KJKZUUMU | Medtronic US Diabetes | Boykin, Chuck | $ 600 | 2 $300, not 6 $100 |
| OT/TRAINING AWARDS SA MARCH TBD | Misc: Empl Gift/Recognition | AMEX Corporate Card | $600.00 | 3/10/2017 | 3/30/2017 | KJKZUUMU | Medtronic US Diabetes | Boykin, Chuck | $ 600 | 2 $300, not 6 $100 |
| ATTENDANCE RAFFLE DRAWING MARCH WK 1,2 | Misc: Empl Gift/Recognition | AMEX Corporate Card | $505.95 | 3/5/2017 | 3/29/2017 | PMWXDLR X | Medtronic US Diabetes | Boykin, Chuck | $ 500 | 1 $500, not 10 $50 |
| EOM OT/ATTENDANCE DRAWINGS | Misc: Empl Gift/Recognition | AMEX Corporate Card | $305.95 | 3/5/2017 | 3/29/2017 | PMWXDLR X | Medtronic US Diabetes | Boykin, Chuck | $ 300 | 1 $300, not 6 $50 |
| OT/EOM RAFFLES ITEMS NORTHRIDGE | Misc: Empl Gift/Recognition | AMEX Corporate Card | $303.95 | 3/5/2017 | 3/29/2017 | PMWXDLR X | Medtronic US Diabetes | Boykin, Chuck | $ 300 | 1 $300, not 6 $50 |

| | | Boykin, Chuck | Medtronic US Diabetes | | | | | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT/EOM RAFFLE DRAWINGS |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 $500, not 10 $100 | $ 1,000 | Boykin, Chuck | Medtronic US Diabetes | PMWXDLRX | 3/29/2017 | 2/21/2017 | $1,011.90 | AMEX Corporate Card | Misc: Empl Gift/Recognition | TARGET SAN ANTONION SAN ANTONIO TX OT AND OCCUPANCY RAFFLE ITEMS |
| 4 $400, not 8 $200 | $ 1,600 | Boykin, Chuck | Medtronic US Diabetes | CRUIRYHD | 3/2/2017 | 2/12/2017 | $1,624.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | CVS/PHAR MACY #03551 SAN ANTONIO TX ATTENDANCE |
| 3 $500, not 15 $100 | $ 1,500 | Boykin, Chuck | Medtronic US Diabetes | OOVIASAX | 2/7/2017 | 1/28/2017 | $1,517.85 | AMEX Corporate Card | Misc: Empl Gift/Recognition | INCENTIVES FOR NR SITE |
| 5 $200, not 10 $100 | $ 1,000 | Boykin, Chuck | Medtronic US Diabetes | OOVIASAX | 2/7/2017 | 1/27/2017 | $1,030.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | TARGET LA CANTERA 21 SAN ANTONIO TX-- ATTENDANCE DRIVE JAN |
| 2 $200, not 8 $50 | $ 400 | Boykin, Chuck | Medtronic US Diabetes | OOVIASAX | 2/7/2017 | 1/23/2017 | $484.92 | AMEX Corporate Card | Misc: Empl Gift/Recognition | SAM'S CLUB 6262 6262 SAN ANTONIO TX- |

| Detail | Amount | Employee | Vendor | Vendor ID | Date | Date | Charge | Card | Category | INCENTIVES OT/EOQ |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 $200, not 10 $100 | $1,000 | Boykin, Chuck | Medtronic US Diabetes | | 2/7/2017 | 1/16/2017 | $1,030.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT DRAWING INCENTIVES |
| 2 $200, 2 $400, not 12 $100 | $1,200 | Boykin, Chuck | Medtronic US Diabetes | OOVIASAX | 2/7/2017 | 1/11/2017 | $1,224.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | OT GIFT CARD WINNERS |
| 1 $500, 1 $200, not 14 gcs | $700 | Boykin, Chuck | Medtronic US Diabetes | OOVIASAX | 2/7/2017 | 1/8/2017 | $704.95 | AMEX Corporate Card | Misc: Empl Gift/Recognition | GIFT CARDS FOR OT DRIVES |
| 1 $400 gc, 1 $200 gc | $600 | Boykin, Chuck | Medtronic US Diabetes | VTGOXXEZ | 1/10/2017 | 12/23/2016 | $622.83 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 7 ITEMS FOR OT RAFFLES PRIZES NR, RAFFLE STILL TBD |
| 2 $300, not 3 $200 | $600 | Boykin, Chuck | Medtronic US Diabetes | BMDQHOEF | 1/10/2017 | 12/19/2016 | $600.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | EACH WON $200 GIFT CARDS. |
| 3 $25, 2 $400, not 8 $100 | $800 | Boykin, Chuck | Medtronic US Diabetes | BMDQHOEF | 1/10/2017 | 12/18/2016 | $887.00 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 3 $25 GIFT CARD WINNERS 8 $100 CARD WINNERS |
| Two $400 gcs, not 4 $100 gcs | $800 | Boykin, Chuck | Medtronic US Diabetes | VTGOXXEZ | 1/10/2017 | 12/6/2016 | $860.69 | AMEX Corporate Card | Misc: Empl Gift/Recognition | 4 $100 GIFT CARDS FOR OT RAFFLE 2 GIFT SETS FOR OT RAFFLE |

$ 64,050

PLTFS NOL – 000079

| Comments | Calculated Exposure not including activation fees | SUBMITTED_DATE | TRANSACTION_DATE | BASEAMOUNT | NOTES | SALES_NOTES | DBA_NAME | ADDRESS | CITY |
|---|---|---|---|---|---|---|---|---|---|
| March 2020 - no record on incentive tracking | 500 | 4/23/2020 | 3/13/2020 | $505.95 | SUPERVISOR OT INCENTIVES;$505.95. | Normal Territory Coverage | CVS/PHARMACY #03551 | 23530 WILDERNESS OAK | SAN ANTONIO |
| March 2020 - no record on incentive tracking | 400 | 4/23/2020 | 3/13/2020 | $413.90 | MARCH OT INCENTIVES. $206 EACH REP | Normal Territory Coverage#!#10#!# | STAPLES 1879 | 18203 RIM DR | SAN ANTONIO |
| March 2020 - no record on incentive tracking | 400 | 4/13/2020 | 3/13/2020 | $412.00 | 2 @$200 GIFT CARDS FOR OT DRIVE. $6 ACTIVATION FEE FOR EACH CARD | Normal Territory Coverage#!#10#!# | TARGET T1354 | 18288 BLANCO RD | SAN ANTONIO |
| Feb 2020 - $1550 gcs per the tracker were bought by Chuck. Chuck submitted $4,000 of gift card PL expenses. | 2450 | 4/23/2020 | 2/23/2020 | $625.15 | OT INCENTIVES GIFT CARDS: $206 ENGLAN, $206 MARC DORIA, $106 MARSHEA, $106 LAURA. | Normal Territory Coverage#!#10#!# | TARGET T1354 | 18288 BLANCO RD | SAN ANTONIO |

TES NOL – 000080

| OT Incentives | Coverage | Store | Address | City | Amount | Date | Date |
|---|---|---|---|---|---|---|---|
| OT INCENTIVES: ANGIE $500 GIFT CARD WITH 5.95 ACTIVATION, MICHAEL $200 GIFT CARD WITH 5.95 ACTIVATION | Normal Territory Coverage#!#10#!# | HEB #658 | CYPRESS 3RD | SAN ANTONIO | $712.90 | 2/22/2020 | 4/13/2020 |
| OT INCENTIVES: 4 AT $100 WITH $5.38 ACTIVATION FEE WITH EACH, 2 @ $200 WITH $6.48 ACTIVATION FEE FOR EACH | | SAM'S CLUB 4914 | 2530 MARSHALL RD | SAN ANTONIO | $834.48 | 2/21/2020 | 4/13/2020 |
| OT INCENTIVES, 6 $100, 4 $25, 10 ACTIVATION FEES | Normal Territory Coverage#!#10#!# | CVS/PHARMACY #03551 | 23530 WILDERNESS OAK | SAN ANTONIO | $759.50 | 2/21/2020 | 3/30/2020 |
| OT INCENTIVES EA $50 REWARDS CARD WITH ACTIVATION FEE. | Normal Territory Coverage#!#10#!# | HEB #658 | CYPRESS 3RD | SAN ANTONIO | $494.55 | 2/21/2020 | 3/30/2020 |
| 2 @ $200 WITH $6.48 ACTIVATION FEE ON EACH | Normal Territory Coverage#!#10#!# | SAM'S CLUB 4914 | 2530 MARSHALL RD | SAN ANTONIO | $206.48 | 2/21/2020 | 4/13/2020 |
| OT DRIVE, $200 EACH PERSON, PLUS ACTIVATION FEE WITH $6 ACTIVATION FOR A EACH CARD | Normal Territory Coverage#!#10#!# | TARGET T1354 | 18288 BLANCO RD | SAN ANTONIO | $412.00 | 2/19/2020 | 4/13/2020 |

Total 3750

# EXHIBIT 8

PLTFS NOL – 000082

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF ANOKA                              TENTH JUDICIAL DISTRICT

---

Medtronic, Inc., and MiniMed Distribution              Case Type:  Other Contracts
Corp.,                                                 Court File No.:  _____
                                                       Judge:  _____
                         Plaintiffs,

                                                  **NOTICE OF MOTION AND MOTION**
           v.                                     **FOR TEMPORARY RESTRAINING**
                                                  **ORDER AND EXPEDITED DISCOVERY**
Charles Boykin and Dexcom, Inc.,

                         Defendants.

---

TO:     DEFENDANTS CHARLES BOYKIN AND DEXCOM, INC.

        **PLEASE TAKE NOTICE** that on a date and time to be set by the court following the

filing of this action, Plaintiffs Medtronic, Inc. and MiniMed Distribution Corp. (collectively

"Medtronic") will move the Court pursuant to Minnesota Rule of Civil Procedure 65 as follows:

        1.      For an Order that during the pendency of this action and until further order of the

Court, Defendant Charles Boykin ("Boykin") and his heirs, successors, agents, and assigns, and

all persons in active concert or participation with them who receive actual notice of the Court's

Order, shall be temporarily enjoined and restrained from breaching Boykin's Employee

Agreement with Medtronic by directly or indirectly performing services for Defendant Dexcom,

Inc. ("Dexcom") in connection with or relating to the Dexcom G6 CGM System and related

support services or other COMPETITIVE PRODUCTS or COMPETITIVE RESEARCH AND

SUPPORT, as those terms are defined in Boykin's Employee Agreement with Medtronic.

        2.      For an Order setting a time, date, and place of hearing upon a Motion for

Temporary Injunction by Medtronic.

3.      For an Order directing that the parties immediately commence and engage in expedited discovery, including forensic analysis of Boykin's electronic devices and external storage devices, pursuant to Rules 16.01, 16.02(d), 16.03(f), 30.01, 33.01(b) and 34.02 of the Minnesota Rules of Civil Procedure, to be completed prior to the hearing on Medtronic's Motion for Temporary Injunction, as set forth in more detail in the Proposed Order submitted herewith.

4.      Awarding Medtronic such other, different, or further temporary relief as the Court may deem just and equitable.

This Motion is based upon all the files, records, and proceedings herein, including the Complaint, Plaintiffs' Memorandum of Law in Support of Motion for Temporary Restraining Order and Expedited Discovery, and its supporting declarations and accompanying exhibits, and the arguments of counsel.


Dated:  September 7, 2021                */s Teresa M. Thompson*
                                         Teresa M. Thompson (#0248940)
                                         Melissa R. Hodge (#0400800)
                                         **FREDRIKSON & BYRON, P.A.**
                                         200 South Sixth Street, Suite 4000
                                         Minneapolis, MN  55402-1425
                                         Telephone:  (612) 492-7000
                                         Email:  tthompson@fredlaw.com
                                                 mhodge@fredlaw.com

                                         *Attorneys for Plaintiffs*


## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minnesota Statute § 549.211, subdivision 3, to the party against whom the allegations in this motion are asserted.

                                         *s/ Teresa M. Thompson*
                                         Teresa M. Thompson

PLTFS NOL – 000084

# EXHIBIT 9

PLTFS NOL – 000085

Electronically Served
9/16/2021 2:05 PM
Anoka County, MN

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF ANOKA** | **TENTH JUDICIAL DISTRICT** |

Medtronic, Inc. and MiniMed Distribution Corp.

                 Plaintiffs,

v.

Charles Boykin and Dexcom, Inc.,

                 Defendants.

Case Type: Other Contracts
Court File No.: _____
Judge: _____

**ORDER FOR TEMPORARY
RESTRAINING ORDER AND
EXPEDITED DISCOVERY**

The above-entitled matter came before the Court, on the Motion of Plaintiffs Medtronic, Inc. and MiniMed Distribution Corp. for a Temporary Restraining Order and Expedited Discovery ("Motion").

Fredrikson & Byron P.A. by Teresa M. Thompson and Melissa R. Hodge appeared on behalf of Plaintiffs.

Based on the arguments and submissions of counsel and upon all of the files, records and proceedings herein, and for purposes of this Motion only, the Court makes the following:

## FINDINGS OF FACT

1.     Plaintiff Medtronic, Inc. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota. MiniMed Distribution Corp. is a wholly-owned subsidiary of Medtronic Minimed, Inc., which is a wholly-owned subsidiary of Medtronic, Inc. MiniMed Distribution Corp. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota. MiniMed Distribution Corp. is the employer of the Customer Service Operations Department team for Medtronic, Inc.'s Diabetes business. Plaintiffs are collectively referred to herein as "Medtronic."

2.      Medtronic's business is organized into 20 Operating Units that each focus on a narrow disease state or specialty physician type, one of which is the Diabetes Operating Unit. The Diabetes Operating Unit is supported by its Customer Service Operations Department, which provides support services for Medtronic Diabetes products, including its line of MiniMed™ insulin pump systems ("Insulin Pump Systems"), Guardian™ Connect continuous glucose monitoring system ("Guardian™ Connect System"), and other Diabetes management products. Because of the ongoing nature of Diabetes management and use of Diabetes management products, support services are an integral part of the customer experience and the ability to capture market share.

3.      Defendant Charles Boykin ("Boykin") is a former employee of Medtronic who worked as a Senior Customer Service Manager in the Customer Service Operations Department for six years before his termination effective January 2, 2021. For the duration of his employment with Medtronic, Boykin was a resident of and worked in San Antonio, Texas.

4.      The month after his termination, Boykin was hired by Defendant Dexcom, Inc. ("Dexcom") as Senior Director of Dexcom's global technical support operations. Dexcom is Medtronic's primary competitor in the continuous glucose monitoring market.

5.      At the time of his termination, Boykin subject to a Medtronic Employee Agreement (the "Agreement"). Boykin signed the Agreement during his employment with Medtronic in exchange for a substantial increase in compensation.

6.      The Agreement contains the following two-year noncompete covenant applicable to employees like Boykin who were not engaged solely in sales activities during their last year of employment with Medtronic:

> **4.1     Restrictions on Competition.** Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last

PLTFS NOL – 000087

> day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT. . . .

7.    Boykin further agreed to abide by restrictions on use or disclosure of Medtronic's

confidential information, as follows:

> **3.6   Nondisclosure of CONFIDENTIAL INFORMATION.**
> Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after employment, for as long as the information retains the characteristics described in Section 1.3. Employee further agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services. This provision is intended to govern any disclosure outside of MEDTRONIC.

8.    The Agreement contains the following definitions:

> **1.1 COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

> **1.2 COMPETITIVE RESEARCH AND SUPPORT** means any research, development, analysis, planning or support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulator or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service or a COMPETITIVE PRODUCT.

3

**1.3 CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

**1.4 CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

**1.8 MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods,

PLTFS NOL – 000089

products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

9.      Throughout his employment with Medtronic, Boykin was provided with CONFIDENTIAL INFORMATION of Medtronic, including information regarding Medtronic's quality assurance processes, research and development relating to new products and how to support them, detailed information regarding Medtronic product performance, complaint volumes, complaint data, processes for addressing patient questions and complaints, troubleshooting guidelines, technical support processes for products, optimization processes, and FDA audit information, all relating to Medtronic's Diabetes Operating Unit.  Boykin was embedded in every key division of Medtronic's Diabetes Operating Unit, acting as a conduit between the Customer Service Operations Department and the Research and Development, Quality, and Regulatory teams.  Boykin also assisted Medtronic through several key customer service initiatives during his employment, including the expansion of Medtronic's United States call center operations to the Philippines and the launch of the Guardian™ Connect System and related support services.

10.      The noncompete covenant contained in Boykin's Agreement is reasonable and necessary to protect Medtronic's legitimate business interests in its CONFIDENTIAL INFORMATION.

11.      Boykin is currently employed by Dexcom as Senior Director of Dexcom's global technical support operations.  In that role, he is performing nearly identical services to those he performed at Medtronic as Senior Customer Service Manager.  Moreover, the job description that Medtronic believes Dexcom posted for the role ultimately filled by Boykin includes responsibilities that inherently involve direct application of the confidential and proprietary

5

information that Boykin acquired with Medtronic, especially as to the customer service and support processes that it developed at significant time and expense.

12.     Dexcom's continuous glucose monitoring system, the Dexcom G6 CGM System, directly competes with Medtronic's Guardian™ Connect System.   The Dexcom G6 CGM System is Dexcom's principal product, and the support services related to the Dexcom G6 CGM System are the primary focus of Dexcom's technical support operations.

13.     Dexcom uses the same technical support vendor that Medtronic previously used and that Boykin had in-depth knowledge and proficiency in dealing with as a result of his employment with Medtronic—Teleperformance.   Boykin was also actively involved in Medtronic's development of a better technical support solution exclusively for Medtronic, which replaced Medtronic's use of Teleperformance.   Dexcom indicated through its job posting for Boykin's position that it was interested in developing a global technical support strategy, establishing global technical support functions, and having the employee lead key initiatives. Medtronic outperforms Dexcom as to technical support services, and a notable improvement in Dexcom's technical support and customer service as a result of the confidential and proprietary information Boykin acquired at Medtronic would give Dexcom a strategic and unfair advantage in the continuous glucose monitoring market.

14.     Dexcom is a CONFLICTING ORGANIZATION under the Agreement because it is engaged in or is about to become engaged in the development, design, production, manufacture, promotion, marketing, sale, and support of the Dexcom G6 CGM System and related support services, which is COMPETITIVE RESEARCH AND SUPPORT and a COMPETITIVE PRODUCT.

PLTFS NOL – 000091

15.     The support services for Dexcom's G6 CGM System are COMPETITIVE RESEARCH AND SUPPORT because they are support services for Dexcom, a CONFLICTING ORGANIZATION, that are intended for, or may be useful in, assisting, improving, or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT, specifically Medtronic's Guardian™ Connect System and related support services.

16.     Dexcom's G6 CGM System and related support services are a COMPETITIVE PRODUCT under the Agreement because they perform the same or similar functions as, may be substituted for, or are intended or used for the same purposes as a MEDTRONIC PRODUCT, specifically Medtronic's Guardian™ Connect System and related support services.

17.     Medtronic's Guardian™ Connect System and related support services are a MEDTRONIC PRODUCT under the Agreement because Boykin's services related to them during the last year of his employment with Medtronic

18.     Thus, Boykin's employment with Dexcom in connection with the Dexcom G6 CGM System and related support services is a breach of Sections 4.1 and 3.6 of the Agreement.

19.     Medtronic lacks an adequate remedy at law for Boykin's breaches of the Agreement, which threaten Medtronic with irreparable harm, including the misappropriation of its CONFIDENTIAL INFORMATION.

Based upon the foregoing, and for purposes of this Motion only, the Court makes the following:

## <u>CONCLUSIONS OF LAW</u>

1.     The test for determining whether a temporary restraining order is appropriate requires consideration of five factors:

7

1.      The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief;

2.      The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial;

3.      The likelihood that one party or the other will prevail on the merits;

4.      Relevant public policy considerations; and

5.      The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros. Inc. v. Ford Motor Co.*, 137 N.W.2d 314, 32–22 (Minn. 1965).

2.      The nature of the parties' relationship favors granting Medtronic a temporary restraining order because Boykin freely entered into the noncompete and confidentiality provisions and received CONFIDENTIAL INFORMATION from his employment.

3.      The relative harms favor granting Medtronic a temporary restraining order. Medtronic faces irreparable harm from Boykin's actual and threatened breaches of his noncompete covenant and misappropriation of Medtronic's CONFIDENTIAL INFORMATION because of the difficulty of quantifying damages. Conversely, Boykin will not be substantially harmed by a temporary restraining order because he voluntarily agreed to the noncompete and confidentiality provisions.

4.      Medtronic is likely to succeed on the merits of its breach of contract claim against Boykin. Minnesota law governs the Agreement. Boykin and Medtronic are parties to the Agreement. All conditions precedent under the Agreement have occurred. The Agreement is supported by consideration. Under Minnesota law, the noncompete covenant contained in Section 4.1 and confidentiality restriction contained in Section 3.6 of the Agreement are

PLTFS NOL – 000093

reasonable and necessary to protect Medtronic's legitimate business interests. Boykin's employment with Dexcom breaches Section 4.1 of the Agreement because Dexcom is a CONFLICTING ORGANIZATION and the Dexcom G6 CGM System and related support services are a COMPETITIVE PRODUCT and COMPETITIVE RESEARCH AND SUPPORT under the Agreement. Boykin's employment with Dexcom also breaches Section 3.6 of the Agreement because his employment with Dexcom involves use, disclosure, or reliance on Medtronic's CONFIDENTIAL INFORMATION. Medtronic lacks an adequate remedy at law for Boykin's breach of the Agreement, which threatens Medtronic with irreparable harm, including the misappropriation of its CONFIDENTIAL INFORMATION.

5.     Public policy favors enforcing reasonable restrictive covenants, protecting confidential information, and restraining unfair competition.

6.     A temporary restraining order will impose no administrative burden on the Court.

## **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED as follows:

1.     Medtronic's Motion for a Temporary Restraining Order and Expedited Discovery is granted.

2.     During the pendency of this action and until further notice of the Court, Boykin, and his heirs, successors, agents, and assigns, and all persons in active concert or participation with them who receive actual notice of the Court's order, shall be and hereby are temporarily enjoined and restrained from breaching Boykin's Agreement with Medtronic by directly or indirectly performing services for Dexcom in connection with or relating to the Dexcom G6 CGM System and related support services or other COMPETITIVE PRODUCTS or COMPETITIVE RESEARCH AND SUPPORT.

PLTFS NOL – 000094

3.      Pursuant to Rules 16.01, 16.02, 16.03(f), 30.01, 33.01(b), and 34.02 of the Minnesota Rules of Civil Procedure, Defendants shall be and hereby are ordered prior to the hearing upon Medtronic's Motion for a Temporary Injunction to engage in expedited discovery as follows:

(a)     Requiring Defendants to respond to written discovery served prior to the hearing upon Medtronic's Motion for Temporary Injunction within fourteen days after the date of service thereof;

(b)     Requiring Boykin to produce any electronic devices and external storage devices which he accessed or used while employed with Medtronic and/or since joining Dexcom for forensic analysis within five days after the date of service of Medtronic's written discovery;

(c)     Requiring Defendants to make themselves and their witnesses available for depositions prior to the hearing upon Medtronic's Motion for Temporary Injunction within fourteen days after the date responses to written discovery are served; and

(d)     Requiring, pending entry of a final protective order agreed upon by the parties and issued by the Court,

(i)     That all responses and documents served or produced in response to discovery requests which are marked "Confidential" be disclosed only to the parties and their counsel for use exclusively in connection with the above-entitled action; and

(ii)    That all responses and documents served or produced in response to discovery requests which are marked "Highly Confidential" be disclosed

10

only to counsel for the parties for use exclusively in connection with this action.

4.      A hearing shall be held on Medtronic's Motion for a Temporary Injunction at 9:00 a.m. on _____October 22_____, 202_1_, [at the Anoka County Courthouse, 325 East Main Street, Anoka, MN 55303-2489][Via Zoom].

5.      This Order shall take effect immediately and remain in effect during the pendency of this action and the Court waives any obligation of Medtronic to post a bond pursuant to Rule 65 of the Minnesota Rules of Civil Procedure.

09/14/2021 06:13:12 PM
BY THE COURT:

Dated: __September 14__, 2021

_____
Nancy L Logering
The Honorable
Judge of District Court

PLTFS NOL – 000096

# EXHIBIT 10

PLTFS NOL – 000097

## Barnes, Brook T.

| | |
|---|---|
| **From:** | Barnes, Brook T. |
| **Sent:** | Tuesday, September 28, 2021 2:50 PM |
| **To:** | 'Thompson, Teresa' |
| **Cc:** | 'Joel Schroeder' |
| **Subject:** | California Litigation: Dexcom/Boykin v. Medtronic 3:21-cv-01677-H-LL |
| **Attachments:** | ECF order.pdf; Complaint and Civil Cover Sheet.pdf; Summons.pdf; File Stamped Exhibits 1-7 to Complaint.pdf |

Good Afternoon, Teresa

Earlier today I emailed you asking if you would accept service on behalf of Medtronic, but I have not received a response. Nonetheless, I'm attaching courtesy copies of the California matter for your client's review. We will move forward with service unless I hear from you today. Please note that we received a minute order from the clerk that the matter has been assigned to Hon. Marilyn L. Huff (attached).

Additionally, please note that Dexcom and Mr. Boykin will seek a TRO and injunctive order from the Court to confirm that Mr. Boykin's employment is lawful under California law. Once the application is filed, I will provide you with notice of the hearing date.

Should you have any questions, please do not hesitate to call me.

Thank you,

Brook

**BROOK T. BARNES**
PARTNER

P. 619.525.3810 | F. 619.788.5508 | brook.barnes@procopio.com
525 B STREET, SUITE 2200, SAN DIEGO, CA 92101
procopio.com



PLTFS NOL – 000098

# EXHIBIT 11

PLTFS NOL – 000099

**Medtronic**





# EMPLOYEE AGREEMENT

## INTRODUCTION

Medtronic and the undersigned Employee recognize it is important that Medtronic protect its rights with respect to its confidential business and product information, inventions, and customer relationships without unduly impairing the Employee's ability to pursue his/her profession.  Medtronic and the Employee also recognize that Medtronic provides valuable training to Employee, entrusts Employee with confidential information, business and customer relationships and goodwill, and compensates Employee to support, develop, administer, maintain, promote, market and/or sell Medtronic products.

Accordingly, Employee enters into this Agreement in consideration for one or more of the following: (i) Medtronic's offer of employment or continuing employment and the benefits associated with that employment; (ii) Medtronic's promise of granting Employee access to confidential information necessary to perform Employee's duties; (iii) Medtronic's actual grant to Employee of access to confidential information necessary to perform the Employee's duties; (iv) Medtronic's promise to provide Employee valuable training, (v) Medtronic's actual provision of training to Employee; (vi) Medtronic's promise to provide Employee access to Medtronic's business and customer relationships and goodwill; (vii) Medtronic's actual provision to Employee of access to Medtronic's business and customer relationships and goodwill; (viii) Medtronic's obligations to the Employee contained in this Agreement; (ix) or other consideration which the Employee acknowledges was received and was sufficient consideration for the promises in this Agreement.

## SECTION 1:  DEFINITIONS

**PLEASE NOTE:  Terms that are CAPITALIZED have the following defined meaning whenever used in this Agreement:**

1.1 **COMPETITIVE PRODUCT** means goods, products, product lines or services, and each and every component thereof, developed, designed, produced, manufactured, marketed, promoted, sold, supported, serviced, or that are in development or the subject of research by anyone other than MEDTRONIC that are the same or similar, perform any of the same or similar functions, may be substituted for, or are intended or used for any of the same purposes as a MEDTRONIC PRODUCT.

1.2 **COMPETITIVE RESEARCH AND SUPPORT** *means any research, development, analysis, planning or* support services of any kind or nature, including without limitation theoretical and applied research, or business, technical, regulatory or systems research, analysis, planning or support, for a CONFLICTING ORGANIZATION that is intended for, or may be useful in, assisting, improving or enhancing any aspect of the development, design, production, manufacture, marketing, promotion, sale, support or service of a COMPETITIVE PRODUCT.

1.3 **CONFIDENTIAL INFORMATION** means any information relating to MEDTRONIC's business, including a formula, pattern, compilation, program, device, method, technique, system, plan, or process, that the Employee learns or develops during the course of Employee's employment by MEDTRONIC that derives independent economic value from not being generally known, or readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.   CONFIDENTIAL INFORMATION includes but is not limited to trade secrets and INVENTIONS and, without limitation, may relate to research; development; experiments; clinical

EXHIBIT A

investigations; clinical trials; clinical and product development results and data; engineering; product specifications; computer programs; computer software; hardware configurations; manufacturing processes; compositions; algorithms; know-how; methods; machines; management systems and techniques; strategic plans; long-range plans; operating plans; organizational plans; financial plans; financial models; financial projections; nonpublic financial information; business, financial, planning, and strategic systems and methods; operating systems; information systems; acquisition and divestiture goals, plans, strategies or targets; regulatory strategies, plans and approaches; quality control systems and techniques; patent and intellectual property strategies, plans and approaches; vendor and customer data; employee and personnel data; human resources goals, plans and strategies; human resource management techniques; sales volumes; pricing strategies; sales and marketing plans and strategies; contracts and bids; and any business management techniques that are being planned or developed, utilized or executed by MEDTRONIC.

**1.4  CONFLICTING ORGANIZATION** means any person (including the Employee) or entity, and any parent, subsidiary, partner or affiliate (regardless of their legal form) of any person or entity, that engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a COMPETITIVE PRODUCT or in COMPETITIVE RESEARCH AND SUPPORT.

**1.5  INVENTION(S)** means any and all inventions, discoveries, ideas, processes, writings, works of authorship, designs, developments and improvements, whether or not protectable under the applicable patent, trademark or copyright statutes, generated, conceived or reduced to practice by the Employee, alone or in conjunction with others, while employed by MEDTRONIC.

**1.6  MEDTRONIC** means Medtronic plc, and each and all entities wherever located that are directly or indirectly wholly or partly owned or controlled by, or that are directly or indirectly under the common control or ownership of, Medtronic plc, including but not limited to all of Medtronic plc's direct and indirect subsidiary, parent, sibling entities, and affiliates, and each of their respective direct and indirect subsidiary, parent, sibling entities, and affiliates, and each of their respective successors and assigns, that exist now or in the future.

**1.7  MEDTRONIC CUSTOMER(S)** means any person, entity or institution, including the employees, agents or representatives thereof, who controlled, directed or influenced the purchasing decisions of any such person, entity or institution, to whom or to which Employee sold, negotiated the sales, supported, marketed or promoted products or services on behalf of MEDTRONIC during the last one (1) year in which Employee was employed by MEDTRONIC.

**1.8  MEDTRONIC PRODUCT(S)** means any goods, products, or product lines (a) that the services the Employee (or persons under Employee's management, direction or supervision) performed for MEDTRONIC related to, directly or indirectly, during the last one (1) year in which the Employee was employed by MEDTRONIC, including without limitation services in the areas of research, design, development, production, manufacture, marketing, promotion, sales, or business, technical, regulatory or systems research, analysis, planning or support relating to such goods, products, or product lines, or (b) with respect to which Employee at any time received or otherwise obtained or learned CONFIDENTIAL INFORMATION.

## SECTION 2: EMPLOYMENT

**2.1  <u>Employment At-Will.</u>**  MEDTRONIC agrees to employ or continue to employ Employee at-will.  The parties agree that either party may terminate Employee's employment at any time for any reason.  This Agreement is ancillary to at-will employment and does not purport to include all of the terms

of, or supersede, that relationship.  This Section 2.1 does not apply if Employee and MEDTRONIC are parties to an existing written term employment agreement.

**2.2   Compensation.**  The compensation, benefits, and other financial terms and conditions applicable to Employee's employment at the inception of this Agreement are set forth in separate documents provided to Employee.  Any changes in the compensation and/or benefits of Employee after this Agreement becomes effective shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.

**2.3   Duties.**  Employee agrees to devote Employee's full working time and attention to diligently, loyally and faithfully performing and discharging the duties assigned to Employee from time to time, and all duties associated therewith, to engage in no activities detrimental to MEDTRONIC's interests, to be employed by or represent no other persons or entities in the same or similar business as MEDTRONIC while employed by MEDTRONIC, to be familiar with MEDTRONIC policies that relate to Employee's duties, and to abide by MEDTRONIC's policies as they exist from time to time, including, without limitation, MEDTRONIC's policies regarding Code of Conduct, Business Conduct Standards, and CONFIDENTIAL INFORMATION.  This Agreement continues in force and effect if the Employee's duties, title, or location of work for MEDTRONIC change after this Agreement becomes effective, and any such change shall not terminate or invalidate this Agreement or affect or impair the validity or enforceability of this Agreement.  The obligations of Employee pursuant to this Section 2.3 shall not in any way be limited or restricted by any other provision in this Agreement.

**2.4   Protection of Former Employer.**   Employee agrees not to divulge to, or use for the benefit of, MEDTRONIC any proprietary, trade secret, or confidential information of a former employer.

**SECTION 3:   TRAINING, CONFIDENTIAL INFORMATION AND GOODWILL**

**3.1   MEDTRONIC's Promises To Employee.**   MEDTRONIC agrees that:  (a) upon commencement of employment it will provide Employee with one or more of the following:  appropriate valuable training which may include but not be limited to self-study materials and course work, classroom training, on-the-job training, and other forms of training, MEDTRONIC's valuable business and customer relationships, MEDTRONIC's goodwill, and CONFIDENTIAL INFORMATION; and (b) from time to time throughout the course of Employee's employment, MEDTRONIC will continue to provide training, access to valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION to Employee.

**3.2   Goodwill.**   Employee acknowledges that MEDTRONIC owns the goodwill in Employee's relationships with MEDTRONIC CUSTOMERS that Employee maintains or develops in the course and scope of Employee's employment by MEDTRONIC.  If Employee owned goodwill in customer relationships when Employee commenced employment with MEDTRONIC, Employee irrevocably assigns any and all such goodwill to MEDTRONIC, and MEDTRONIC shall become the sole owner of such goodwill.

**3.3   Employee's Use of Training, Business and Customer Relationships, Goodwill and CONFIDENTIAL INFORMATION.**   MEDTRONIC agrees to provide Employee with valuable training and to entrust Employee with such of MEDTRONIC's valuable business and customer relationships, goodwill and CONFIDENTIAL INFORMATION as is necessary for Employee to discharge Employee's duties.  Employee agrees to use such valuable training and to continue to develop such relationships, goodwill and CONFIDENTIAL INFORMATION solely and exclusively for MEDTRONIC's benefit.

**3.4   Fiduciary Duties.**  Employee agrees that Employee shall treat all CONFIDENTIAL INFORMATION, training, business and customer relationships, and goodwill entrusted to Employee by MEDTRONIC

PLTFS NOL – 000102

as a fiduciary, and Employee accepts and undertakes all of the obligations of a fiduciary, including loyalty, good faith, trust, confidence and candor, and Employee agrees to use such training and to maintain, protect and develop CONFIDENTIAL INFORMATION, business and customer relationships, and goodwill solely and exclusively for the benefit of MEDTRONIC.  The obligations of Employee pursuant to this Section 3.4 shall not in any way be limited or restricted by any other provision in this Agreement.

3.5 **MEDTRONIC Property.**  All documents and things provided to Employee by MEDTRONIC for use in connection with Employee's employment, or created by the Employee in the course and scope of Employee's employment by MEDTRONIC, are the property of MEDTRONIC and shall be held by Employee as a fiduciary on behalf of MEDTRONIC.  Upon termination of Employee's employment, Employee shall return promptly to MEDTRONIC, without the requirement of a prior demand by MEDTRONIC, all such documents and things, together with all copies, recordings, abstracts, notes, reproductions or electronic versions of any kind made from or about the documents and things or the information they contain.

3.6 **Nondisclosure of CONFIDENTIAL INFORMATION.**  Employee agrees not to use or disclose any CONFIDENTIAL INFORMATION to or for the benefit of anyone other than MEDTRONIC, either during or after employment, for as long as the information retains the characteristics described in Section 1.3.  Employee further agrees and understands that this provision prohibits Employee from rendering services to a CONFLICTING ORGANIZATION following termination of employment with MEDTRONIC to the extent that Employee would use, disclose or rely upon CONFIDENTIAL INFORMATION or be induced or required to use, disclose or rely upon CONFIDENTIAL INFORMATION during the course of rendering such services.  This provision is intended to govern any disclosure outside of MEDTRONIC.  Please refer to Medtronic's Global Security Policy for applicable restrictions on sharing CONFIDENTIAL INFORMATION with other MEDTRONIC Employees during your employment with MEDTRONIC.  The obligations of Employee pursuant to this Section 3.6 shall not in any way be limited or restricted by any other provision in this Agreement. Nothing in this Agreement prohibits Employee from reporting an event that Employee reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information within the limitations permitted by the 2016 Defend Trade Secrets Act (DTSA).  Employee is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (A) is made **in confidence to** a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made **solely for the purpose of** reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, **if such filing is made under seal** so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document contain the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

3.7 **Nondisclosure of Legally Protected Information.**  Employee acknowledges and agrees that various federal, state and local statutes, laws, rules, and regulations regulate, prohibit, or restrict access to and the use and dissemination of data and information about patients, customers, health care providers, or others ("Legally Protected Information").  Such Legally Protected Information may include, by way of example but not by way of limitation, patient data, employee data, credit card data, medical records, social security numbers, Medicare or Medicaid data, drivers' license numbers, information protected by HIPAA, and similar types of information.  Employee agrees not to use or

disseminate any Legally Protected Information for any purpose not permitted by the applicable federal, state and local statutes, laws, rules, and regulations.

## SECTION 4:  POST-EMPLOYMENT RESTRICTIONS

4.1  **Restrictions on Competition.**   Employee agrees that while employed by MEDTRONIC, and for two (2) years after the last day Employee is employed by MEDTRONIC, Employee will not be employed by or otherwise perform services for a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.  If, however, during the last twelve (12) months of employment with MEDTRONIC, Employee had no management duties or responsibilities and was engaged exclusively in sales activities, including selling, soliciting the sale, or supporting the sale of MEDTRONIC PRODUCTS through direct contact with MEDTRONIC CUSTOMERS, this restriction will be for a duration of only one (1) year after the last day Employee is employed by MEDTRONIC, and will prohibit Employee only from soliciting, selling to, contacting, or attempting to divert business from, whether directly or by managing, directing or supervising others, any MEDTRONIC CUSTOMER on behalf of a CONFLICTING ORGANIZATION in connection with or relating to a COMPETITIVE PRODUCT or COMPETITIVE RESEARCH AND SUPPORT.

4.2  **Prohibition on Solicitation of MEDTRONIC Employees.**   Employee agrees that at all times while employed by MEDTRONIC, and for one (1) year thereafter, Employee will not directly or indirectly solicit, cause to be solicited, or participate in or promote the solicitation of any person to terminate that person's employment with MEDTRONIC or to breach that person's employment agreement with MEDTRONIC, or to perform services for or become employed by a CONFLICTING ORGANIZATION.

4.3  **Post-Employment Disclosure.**   In the event Employee's employment with MEDTRONIC terminates, Employee agrees that during the term of the restrictions described in Section 4.1, Employee will immediately inform MEDTRONIC if Employee has accepted an offer of employment from any new employer, and shall immediately disclose to MEDTRONIC in writing the identity of any new employer, the job title of Employee's new position, and a description of any services to be rendered to that employer.  In addition, Employee agrees to respond within ten (10) days to any written request from MEDTRONIC for further information concerning Employee's work activities sufficient to provide MEDTRONIC with assurances that Employee is not violating any of the obligations Employee has undertaken in this Agreement.

## SECTION 5:  COMPENSATION FOR NON-COMPETITION PERIOD

5.1  **Post-Termination Compensation.**   If Employee is unable to accept a bona fide offer of employment from a new employer solely on account of Section 4.1 and subsequently experiences Economic Hardship as a result thereof, MEDTRONIC will make a Payment to the Employee as provided herein.

5.2  **Definitions.**   In this Section 5, "Payment" means an amount equal to the Employee's Monthly Base Pay minus any Other Compensation the Employee receives or is entitled to receive for each month during which benefits are sought (less applicable state and federal taxes).  "Monthly Base Pay" shall be calculated by determining Employee's total salary and commissions (excluding benefits, bonuses, and any indirect or deferred compensation) for the last four (4) full MEDTRONIC fiscal quarters preceding termination of Employee's employment and dividing that amount by twelve (12). "Other Compensation" means unemployment compensation, severance benefits, and earned income whether received from MEDTRONIC or from any source other than MEDTRONIC.  "General Counsel" means the General Counsel of MEDTRONIC or the designee of the General Counsel. "Economic Hardship" results when Other Compensation is less than seventy-five percent (75%) of Employee's Monthly Base Pay.

PLTFS NOL – 000104

**5.3** <u>**Term.**</u>   MEDTRONIC's obligation to make the Payments shall terminate upon expiration of the period specified in Section 4.1 or upon MEDTRONIC's written waiver at any time of Employee's obligations under Section 4.1, whichever comes first.

**5.4** <u>**Requirement of Bona Fide Offer.**</u>   MEDTRONIC shall be obliged to make an initial Payment provided in Section 5.1 only if (1) Employee provides the General Counsel of MEDTRONIC written confirmation of a bona fide offer of employment within ten (10) days after receipt of the offer by the Employee, and (2) the General Counsel determines that Employee is unable to accept the offer solely because of Section 4.1.  Upon making such a determination, the General Counsel shall notify the Employee that the Employee is entitled to an initial Payment, provide the Employee with the address to which Employee shall provide the Reports required by Section 5.5, and direct the appropriate MEDTRONIC personnel to make an initial Payment.

**5.5** <u>**Reporting Requirement.**</u>   After the General Counsel determines that Employee is entitled to receive an initial Payment, MEDTRONIC will be obliged to make any subsequent Payments only if Employee delivers to the address specified by the General Counsel the following Report by the tenth (10th) day of each month in which the Employee seeks to receive subsequent Payments:

(a) A statement describing the details of Employee's good faith efforts during the preceding calendar month to find employment consistent with Employee's education, abilities and experience which would not involve violation of Section 4.1 and describing the reasons, if any, that Employee was unable to find such a position.

(b) A statement by the Employee that the Employee has not violated any provision described in Section 8.3 of this Agreement.

(c) A statement of the name, address and telephone number of any person or entity from which the Employee received earned income during the preceding calendar month.

(d) Written evidence (*e.g.*, check stubs, direct deposit notices) of all Other Compensation received by Employee during the preceding calendar month.

If all required information listed above is timely provided and if MEDTRONIC determines that (1) Employee has made adequate good faith efforts under subparagraph (a) above and (2) the Restrictions on Competition in Section 4.1 have resulted in Economic Hardship to Employee, MEDTRONIC will make a Payment to the Employee.

**5.6** <u>**Right to Waive.**</u>   MEDTRONIC shall have no obligation to make any Payments provided in Section 5.1 if (1) within ten (10) days after MEDTRONIC is provided a copy of the bona fide written offer of employment by Employee, MEDTRONIC, in its sole and unreviewable discretion, provides a complete or conditional waiver of its right to enforce Section 4.1 as to the specific position described in the bona fide offer of employment or (2) within ten (10) days of making a Payment under Section 5.4 or Section 5.5, MEDTRONIC, in its sole and unreviewable discretion, waives its right to enforce Section 4.1 for the remaining period of the restriction.  Such waivers shall be in writing signed by the General Counsel or appointed designee.

## SECTION 6:  INVENTIONS

**6.1** <u>**Disclosure.**</u>  Employee agrees to promptly disclose to MEDTRONIC in writing all INVENTIONS.

**6.2** <u>**Ownership, Assignment and Recordkeeping.**</u> All INVENTIONS shall be the exclusive property of MEDTRONIC.   Employee hereby assigns all INVENTIONS to MEDTRONIC and authorizes MEDTRONIC to file patent applications on Employee's behalf.  Employee agrees to keep accurate,

PLTFS NOL – 000105

complete and timely records of Employee's INVENTIONS, which records shall be the property of MEDTRONIC and shall be retained on MEDTRONIC's premises.

**6.3** __Cooperation.__   During and after the termination of Employee's employment, Employee agrees to give MEDTRONIC all cooperation and assistance necessary to perfect, protect, and use its rights to INVENTIONS.   Without limiting the generality of the foregoing, Employee agrees to sign all documents, do all things, and supply all information that MEDTRONIC may deem necessary to (a) transfer or record the transfer of Employee's entire right, title and interest in INVENTIONS, and (b) enable MEDTRONIC to obtain patent, copyright or trademark protection for INVENTIONS anywhere in the world.

**6.4** __Attorney-in-Fact.__   Employee irrevocably designates and appoints MEDTRONIC and its duly authorized officers and agents as attorney-in-fact to act for and in Employee's behalf and stead to execute and file any lawful and necessary documents, and to do all other lawfully permitted acts, required for the assignment of, application for, or prosecution of any United States or foreign application for letters patent, copyright or trademark with the same legal force and effect as if executed by Employee.

**6.5** __Waiver.__   Employee hereby waives and quitclaims to MEDTRONIC any and all claims, of any nature whatsoever, which Employee may now have or may hereafter have for infringement of any patent, copyright, or trademark resulting from any INVENTION.

**6.6** __Future Patents.__   Any INVENTION relating to the business of MEDTRONIC with respect to which Employee files a patent application within one (1) year following termination of Employee's employment shall be presumed to cover INVENTIONS conceived by Employee during the term of Employee's employment, subject to proof to the contrary by Employee by good faith, contemporaneous, written and duly corroborated records establishing that such INVENTION was conceived and made following termination of employment and without using CONFIDENTIAL INFORMATION.

**6.7** __Release or License.__   If an INVENTION does not relate to the existing or reasonably foreseeable business interests of MEDTRONIC, MEDTRONIC may, in its sole and unreviewable discretion, release or license the INVENTION to the Employee upon written request by the Employee.   No release or license shall be valid unless in writing signed by MEDTRONIC's Chief Patent Counsel or MEDTRONIC's General Counsel.

**6.8** __Notice.__   Pursuant to Minnesota Statutes Section 181.78, Employee is hereby notified that this Agreement does not apply to any INVENTION for which no equipment, supplies, facility or trade secret information of MEDTRONIC was used and which was developed entirely on the Employee's own time, and (1) which does not relate (a) directly to the business of MEDTRONIC or (b) to MEDTRONIC's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the Employee for MEDTRONIC.

## SECTION 7:  GOVERNING LAW, VENUE AND JURISDICTION

**7.1** __Place of Agreement.__   Because the operational headquarters of MEDTRONIC is located in Minnesota and because it is mutually agreed that it is in the best interests of MEDTRONIC and all of its employees that a uniform body of law consistently interpreted be applied to the employment agreements between MEDTRONIC and all of its employees, this Agreement is deemed entered into in the State of Minnesota between MEDTRONIC and Employee, and the substantive laws of Minnesota, without regard to conflict of laws rules, and the exclusive jurisdiction of the courts of Minnesota, shall be applicable hereto on the terms and conditions specified below.

PLTFS NOL – 000106

**7.2** __Governing Law.__  The validity, enforceability, construction and interpretation of this Agreement shall be governed by the laws of the State of Minnesota.  Employee irrevocably waives Employee's right, if any, to have the laws of any state or nation or other legal jurisdiction other than the State of Minnesota apply to this Agreement.

**7.3** __Venue and Personal Jurisdiction.__   Any dispute arising out of or related to this Agreement, or any breach or alleged breach hereof, shall be exclusively decided by a state court in the State of Minnesota.  Employee irrevocably waives Employee's right, if any, to have any disputes between Employee and MEDTRONIC arising out of or related to this Agreement decided in any jurisdiction or venue other than a state court in the State of Minnesota.  Employee hereby irrevocably consents to the personal jurisdiction of the state courts in the State of Minnesota for the purposes of any action arising out of or related to this Agreement.

**7.4** __Covenant Not to Sue.__  Employee irrevocably covenants not to sue MEDTRONIC in any jurisdiction other than a state court in the State of Minnesota for the purposes of any action arising out of or related to this Agreement.  Employee further agrees not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state court in the State of Minnesota; provided, however, that nothing herein shall prohibit or restrict Employee from being a witness or otherwise providing evidence in any action pursuant to court order or subpoena.

## SECTION 8:  OTHER PROVISIONS

**8.1** __Obligations Unconditional.__  The obligation of the parties to perform the terms of this Agreement is unconditional and does not depend on the performance or nonperformance of any terms, duties, or obligations not specifically recited in this Agreement.  Employee irrevocably waives Employee's right to challenge the enforceability or validity of any portion of this Agreement.  It shall not be a defense to any claim brought against Employee by MEDTRONIC that MEDTRONIC has not pursued legal action against any other person or entity, even if that person or entity is identically or similarly situated to Employee.

**8.2** __Waiver.__  No waiver by MEDTRONIC of any breach of this Agreement by Employee shall be valid unless contained in a writing signed by the General Counsel of MEDTRONIC or the General Counsel's designee.  Waiver of any breach of this Agreement shall not constitute, or be deemed, a waiver of any other breach of this Agreement.

**8.3** __Provisions Survive Termination.__  To the extent that any provisions of this Agreement apply to the time period after, or require performance or enforcement after, termination of Employee's employment, all such provisions survive the termination of Employee's employment and termination of this Agreement and may be enforced subsequent thereto.  Without limiting the generality of the foregoing, Section 1, Sections 3.2, 3.3, 3.4, 3.5 and 3.6, Section 4, Section 5, Section 6 and Section 7 each survive termination of Employee's employment and termination of this Agreement.

**8.4** __Prior Agreements.__  Except to the extent provided in Section 8.6, all prior agreements, if any, between MEDTRONIC and Employee relating to any part of the subject matter of this Agreement are superseded and rendered null and void upon execution of this Agreement by Employee; provided, however, that nothing in this Agreement invalidates, renders null or void, or otherwise affects any term or provision of any MEDTRONIC compensation or benefit plan or any agreements related thereto, or any written term employment agreement.

PLTFS NOL – 000107

**8.5** **Application to Employees Who Are Attorneys.**  This agreement will not be interpreted or enforced so as to conflict with any applicable attorney Rules of Professional Conduct relating to the right of a lawyer to practice law.

**8.6** **Validity Not Impaired.**  In the event that any provision of this Agreement is unenforceable under applicable law, the validity or enforceability of the remaining provisions shall not be affected.  To the extent any provision of this Agreement is judicially determined to be unenforceable, any provisions of any prior agreement between Employee and MEDTRONIC addressing the subject matter of the unenforceable provision shall be deemed to govern the relationship between Employee and MEDTRONIC.

**8.7** **Transfer or Assignment.**  MEDTRONIC may transfer or assign its rights and obligations pursuant to this Agreement to its successors or assigns.

**8.8** **Tolling.**  In the event Employee breaches or violates Sections 4.1, 4.2 or 4.3 hereinabove, the duration of the restrictions contained therein shall be extended by the number of days the Employee remains in breach or violation thereof.  This provision may be specifically enforced.

This Agreement becomes binding and effective on MEDTRONIC and Employee upon signature by Employee.

_____       _____       _____
*Employee Signature*                *Employee Name (please print)*        *Date*

Charles Boykin      3/4/2020

# EXHIBIT 12

PLTFS NOL – 000109



6340 Sequence Drive
San Diego, CA 92121
1-888-738-3646
www.dexcom.com

February 2, 2021

Charles Boykin

938 Olivia Vw

San Antonio, Texas 78260

Dear Charles:

Dexcom Inc. ("Dexcom", or the "Company") is an innovative company working to develop technology for the continuous monitoring of glucose in people with diabetes. We are committed to helping people with diabetes live longer, healthier lives. We believe you would make an excellent addition to the Company. Accordingly, Dexcom is pleased to offer you employment on the terms and conditions set forth below.

Dexcom will employ you as **Senior Director Technical Support** and you will report directly to **Charles R Donlon** at our facilities in **San Diego, California**, subject to necessary business travel. The Company may change your position, duties, and work location as it deems necessary.

Your initial annual salary will be **$189,000.00** (your "Base Salary"), less payroll deductions and all required withholdings. You will be paid biweekly and will be eligible to participate in the comprehensive benefit program that we offer to employees and their families, which includes medical, dental and vision insurance plans, a 401(k) investment program, and paid-time-off and holidays. Further details about the Company's benefit program will be provided to you by our Human Resources Department. Dexcom may, in its sole discretion, change your Base Salary or modify the benefit programs in which you participate.

Additionally, you will be eligible to participate in the Company's discretionary bonus plan (as approved each year by the Board of Directors), with a target payout of **25%** of your Base Salary. Bonus is pro-rated if joining between January 1 and September 30, and those hired after September 30th of the plan year are not eligible.

As part of your compensation package, DexCom's management team also will recommend to the Board of Directors that, following the date you begin working for DexCom, you be granted Restricted Stock Units ("RSUs") with a value of **$270,00.00**, which shall vest into shares of DexCom common stock in accordance with the vesting schedule below. The number of RSUs for this award will be determined by dividing the award's dollar value by the 30-day average of DexCom's closing stock price as of five business days prior to the grant date. RSU grants are approved quarterly and your final grant date is determined by Dexcom pursuant to our equity award policy. The RSUs shall vest in three substantially equal annual installments beginning on the first anniversary of the grant date. The RSUs granted to you will be governed by the terms and conditions of the applicable grant agreement and DexCom's Amended and Restated 2015 Equity Incentive Plan, attached as Exhibit 10.42 to our Form 10-Q filed with the Securities and Exchange Commission on August 1, 2017 (the "Terms"). You will be required to electronically accept the Terms of the

Page 1 of 2

award within 60 days after you are notified of your grant by DexCom.

Dexcom will provide you relocation assistance of up to **$57,500.00** to include **$50,000.00** under the Managed Cap Program, and **$7,500.00** Miscellaneous Expense Allowance (subject to applicable taxes and withholdings) as described in the relocation agreement and guidelines attached. Please print, sign and scan a copy of the agreement back to me at allyson.aabram@Dexcom.com.

As a Dexcom employee, you will be expected to abide by the Company's rules and regulations, and to sign and comply with the Employee Proprietary Information and Inventions Agreement, which prohibits unauthorized use or disclosure of Dexcom's proprietary information.

In your work for the Company, you will be expected not to use or disclose any confidential information, including trade secrets, of any former employer or other person to whom you have an obligation of confidentiality. Rather, you will be expected to use only that information which is generally known and used by persons with training and experience comparable to your own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company. You further agree that you will not bring onto Company premises any unpublished documents or property belonging to any former employer or other person to whom you have an obligation of confidentiality.

Dexcom's normal working hours are 8:00 a.m. through 5:00 p.m., Monday through Friday. You may be required to work additional hours as required by the nature of your work assignments. As an exempt employee, you will not be eligible for overtime.

Your employment relationship with Dexcom is at-will. Accordingly, you may terminate your employment with Dexcom at any time, for any reason whatsoever, simply by notifying the Company. Likewise, Dexcom may terminate your employment at any time, with or without cause or advance notice.

This letter, together with your Employee Proprietary Information and Inventions Agreement, forms the complete and exclusive statement of your employment agreement with Dexcom. It supersedes any other agreements or promises made to you by anyone, whether oral or written, and it can only be modified in a written agreement signed by you and by an officer of Dexcom. As required by law, this offer is subject to satisfactory proof of your right to work in the United States. This offer is also subject to the satisfactory completion and results of the Company's required background check.

Please electronically accept this offer of employment within 72 hours if you wish to accept employment at the Company under the terms described above. If you accept our offer, we would like you to start on **February 22, 2021**, or as agreed upon.

We look forward to your favorable reply and to a productive and enjoyable work relationship.


Sincerely,

**Allyson C Aabram**

Dexcom Talent Acquisition

PLTFS NOL – 000111

# EXHIBIT 13

PLTFS NOL – 000112

April 22, 2021


Dear Heather C. Fokken,
710 Medtronic Parkway
Minneapolis, MN 55432


Is response to request for information I received from you on April 22, 2021.


➢ Job Role: Sr. Director.

   Duties: Lead Call Center function for Dexcom.

   Start Date: 2/22/2021

➢ I have returned all Medtronic Property and materials.
➢ I have not disclosed and do not intend to disclose any Medtronic Confidential Information to any company or 3rd party.


Regards,


Charles Boykin

PLTFS NOL – 000113